**Charles Ben HOWELL, Appellant,**

v.

**HOMECRAFT LAND DEVELOPMENT, INC., et al., Appellees.**

No. 05–86–01164–CV.

Court of Appeals of Texas, Dallas.

Oct. 13, 1987.

Rehearing Denied Nov. 23, 1987.

Howard D. Pattison, Athens, Ted M. Akin, Dallas, for appellant.

Edmund R. Wood, Ralph Ross, Robert T. Mowrey, Jennifer T. Altabef, Dallas, for appellee.

Before STEPHEN F. PRESLAR,[1] EARL W. SMITH,[2] and ASHWORTH,[3] JJ.

PER CURIAM.

Appellant Charles Ben Howell appeals a judgment denying him recovery for damages from appellees Homecraft Land Development, Inc., U.S. Home Corporation (collectively "Homecraft"), and Stewart Title Company ("Stewart"). Howell also complains that the trial court erred in awarding Homecraft attorneys' fees for Howell's bad-faith filing of a claim under the Deceptive Trade Practices Act (the "DTPA") and for Homecraft's counterclaim under the Declaratory Judgments Act (the "DJA"). For the reasons given below, we modify the judgment of the trial court to delete the award of attorneys' fees for Homecraft's counterclaim and, as modified, affirm the trial court's judgment.

At the outset, we must address certain preliminary matters. Howell's brief was originally due on March 23, 1987. After some extensions, the brief was due, and filed, on June 23. Subsequently, after the cause was set for submission, Howell requested leave to file an amended brief. We granted that request "only to the extent that leave is granted to file a supplemental brief limited solely to providing authorities for the points of error previously asserted" in the original brief. On September 9, two days before oral argument, Howell filed a "supplemental" brief and a second brief containing "additional points of error." Those additional points of error were also incorporated into the "supplemental" brief.

Homecraft filed a motion to strike both the "supplemental" brief and the additional points of error. Howell filed a motion to reconsider our order denying him leave to file a brief containing additional points of error. Both motions are now before the Court, and we address them now. The "supplemental" brief exceeds two-hundred-fifty pages, over twice the length of the

original brief. We have considered the "supplemental" brief to the extent that it actually supplements the original brief, but we will not address the additional points of error. Howell's motion to reconsider is denied. To the extent that Homecraft's motion requests us to strike the "supplemental" brief, it is denied, but to the extent that the motion requests us to strike Howell's "additional points of error," Homecraft's motion is granted. Howell's "additional points of error" are stricken, both as independently filed and as incorporated into the "supplemental" brief.

We now turn to the merits of this cause. Howell owned certain realty (the "Property"). In late 1980, two affiliated corporations, Homecraft Land Development, Inc., and U.S. Home Corporation, indicated interest in purchasing the Property. The relationship between the two corporations is not altogether clear, but, for our purposes, they may be treated as a single entity, "Homecraft."

In December, 1980, Homecraft wrote a letter of intent to purchase to Howell. Howell replied, expressing an interest in selling the Property, but with certain qualifications. On December 22, Homecraft prepared an earnest money contract and submitted it to Howell. Howell made certain handwritten changes, the most important of which, for our purposes, was that the purchaser, Homecraft, rather than the seller, Howell, should provide a survey of the Property.

On January 16, 1981, Homecraft executed a revised earnest money contract, newly typewritten, incorporating the changes that Howell had made. The contract provided that Homecraft would obtain a survey of the Property to be prepared by "Owen Ayres." On January 23, Howell (actually acting through a close corporation under his control that was then the record owner of the Property) executed the earnest money contract and returned it.

1. The Honorable Stephen F. Preslar, Chief Justice, retired, Court of Appeals, Eighth District of Texas at El Paso, sitting by assignment.

2. The Honorable Earl W. Smith, Justice, retired, Court of Appeals, Third District of Texas at Austin, sitting by assignment.

3. The Honorable Clyde R. Ashworth, Justice, retired, Court of Appeals, Second District of Texas at Fort Worth, sitting by assignment.

In late March, Homecraft notified Howell that it wished to close the conveyance of the Property on April 6, 1981. At some point in early April, Howell was shown the survey that a certain John B. Fincher prepared (the "Fincher Survey"). At the time, Fincher was employed by Owen Ayres and Associates. Howell indicated that he believed that the Fincher Survey was inaccurate. Howell claimed that the Property that he was about to convey contained more square footage than that shown in the Fincher Survey. Since Howell and Homecraft had agreed that the purchase price of the Property was to be $6.00 a square foot, the amount of square footage would determine the amount of the purchase price.

On April 10, the parties met for the closing. Stewart was the title company involved. Howell testified that, at the closing, he still objected to the Fincher Survey and complained that the Property contained more square footage than Homecraft was prepared to pay for. Mike Richards, on behalf of Stewart, told him that Fincher was a partner of Ayres's, and that Fincher's work was reliable. Howell further testified that he was intimidated, because some six people were agitated by the prospect that the closing might not go through, and because Homecraft and Stewart told him that, if the closing did not go through, they would sue Howell for damages.

At any rate, the dispute over the actual amount of square footage in the Property remained. To effectuate the closing, the parties executed a hastily drawn agreement (the "Escrow Agreement"). Its terms provided that Howell "wishe[d] to have another survey prepared in order to verify the square footage" of the Property. Accordingly, Homecraft provided Stewart with the amount of $10,146 to be held in escrow; when Howell provided another survey substantiating his claim of the extra square footage in the Property, he would be paid six dollars for each extra square foot from the escrowed funds. The Escrow Agreement also provided that Stewart would not release the escrowed funds "until in receipt of written verification from both parties [Homecraft and

Howell] ha[d] been received [sic], acknowledging their respective approvals of the outcome of [Howell's survey]." Finally, Homecraft agreed to indemnify Stewart if Stewart released the escrowed funds, provided that Stewart acted with due diligence. The Escrow Agreement had one omission that turned out to be significant: it did not contain a time by which Howell was to provide a new survey.

Once the closing papers, including the Escrow Agreement, had been executed, Homecraft paid Howell $293,820, in two checks. Howell promptly negotiated the checks.

On June 30, nearly three months after the closing, Howell still had not provided another survey establishing his claim that he had conveyed more square footage than he was paid for. Homecraft wrote both Stewart and Howell, stating that the Property had been resurveyed and that Fincher's original results were confirmed. Homecraft added that the City of Dallas Engineering Department concurred with the results of the Fincher Survey and filed the plat of record, certifying the correct area of the Property. (Howell ultimately contended that these contentions by Homecraft were misrepresentations.) Homecraft concluded its letter by stating that, if Howell did not provide a survey in accordance with the Escrow Agreement by August 1, Homecraft wanted Stewart to release the escrowed funds back to Homecraft.

On July 13, 1981, Howell replied to Homecraft's letter. He stated that he did not consider the dispute concerning the exact square footage of the Property to be resolved. He had been very busy because of his workload, he stated, but he would give the matter his "early attention." Finally, he said that he would hold Stewart liable for any improper disbursement of the account funds without his authorization.

At some point after Howell's letter, Stewart in fact released the escrowed funds back to Homecraft. Exactly when it did so is disputed, and the record is not clear. Howell testified that he telephoned

Stewart in late July to inquire about the matter, and was told then that the funds had already been released. One of Homecraft's officers testified that he could not remember when Homecraft obtained the funds, but, under repeated questioning, that it was "less than a month" after Homecraft's letter. Stewart provided an internal escrow receipt memorandum (that Stewart claimed reflected the disbursement of the funds) dated December 11, 1981. Stewart also claimed that all other documentation concerning the funds had been lost by the fall of 1985 (when Howell began discovery in earnest, after he had filed suit). At any rate, it is clear that the escrowed funds remained in escrow for at least three, and possibly eight, months after the closing.

On April 8, 1983, without any further communication to Homecraft and Stewart, and without having provided another survey to substantiate his claim on the exact square footage contained in the Property, Howell sued both Homecraft and Stewart. He originally brought suit in trespass to try title, claiming that the extra square footage for which he had never been paid was still his property. On February 3, 1984, Howard D. Pattison, Howell's trial attorney, wrote the trial court informing it of pending settlement negotiations. Pattison said that Howell would provide Homecraft with a survey to substantiate his claims by May 1, 1984.

Howell did not provide a new survey by that date. On September 14, four and a half months after the date that Pattison had promised, Howell provided Homecraft with a document executed by Barry Rhodes, a surveyor. The document showed a survey dating from 1960 (the "Brewer Survey") overlaid on the Fincher Survey. Rhodes did not certify this document. Howell claimed that the Brewer Survey accurately reflected the square footage in the Property and that it vindicated his claim that he was entitled to approximately $12,000 more for the purchase price. On January 28, 1986, Howell provided a second survey that, he claimed, reconfirmed the Brewer Survey. Again, Rhodes had prepared it, and certified this survey as

follows: "I, Barry Rhodes, Registered Public Surveyor, hereby certify that I have been retained to establish on the ground each of the original corners, intersecting points and boundary lines [of the Property] on the Brewer [S]urvey...."

Howell subsequently amended his petition to include certain DTPA claims. Homecraft counterclaimed for fees for a bad-faith filing under the DTPA and for a declaratory judgment of its obligations under the Escrow Agreement and for fees under the DJA. On these pleadings, the case finally went to trial on June 2, 1986. On June 4, two days later, Howell provided yet one more survey prepared by Rhodes, reconfirming Rhodes' earlier work and making annotations on the Brewer Survey. Some two weeks later, the jury returned its verdict. It found that Howell had waived his claim for damages for the loss of the extra square footage in the Property, because he had failed to provide a timely survey supporting that claim. It also found that Howell had filed his DTPA claims in bad faith. No issue had been submitted to the jury on the amount of attorneys' fees necessary for Homecraft to prosecute its counterclaim under the DJA. The trial court rendered judgment on the verdict. It further found that Homecraft was entitled to $12,000 as reasonable attorneys' fees for its DJA counterclaim, and increased the fees awarded by the jury accordingly. From this judgment, Howell appeals.

In his ninth point of error, Howell asserts that the jury's finding of waiver—that he had waived his claim for damages for the extra square footage that he alleged—was either an incompetent issue or not supported from the evidence. His actual argument appears to be that, as a matter of law, waiver cannot apply to his case, because waiver applies only to rights that a party has. He argues that there was no consideration for the Escrow Agreement, so that it was not an enforceable contract. Because, according to his argument, it was not an enforceable contract, he concludes that it bestowed upon him no rights, so

that he cannot be held to have waived those rights that he did not have.

When two instruments are executed at the same time, for the same purpose, and in the same transaction, the two instruments are to be read and construed together, as one contract. *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex.1981); *Wasaff v. Lipscomb,* 713 S.W.2d 730, 732 (Tex.App.—Houston [14th Dist.] 1986, no writ). We conclude that the Escrow Agreement was merely part of the larger closing contract, and that it was supported by the same consideration that supported the conveyance of the Property generally. Therefore, the Escrow Agreement was an enforceable contract and did bestow certain rights upon Howell, which he could waive.

We now consider Howell's argument that the jury's finding that Howell had waived his rights under the Escrow Agreement is not supported by the evidence. In considering a "no evidence" point, we must disregard all evidence contrary to the jury findings, and, if there is any remaining evidence that would support the verdict, the trial court's judgment must be upheld. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696–97 (Tex.1986). The evidence favorable to the verdict was that Howell had executed closing documents with Homecraft on April 10, 1981; that, among these documents was the Escrow Agreement stipulating that Howell would be paid for his claim for the extra square footage if he provided Homecraft with a survey supporting that claim; and that Howell had not provided Homecraft with any kind of survey before filing suit on April 8, 1983, or indeed until the first document prepared by Rhodes on September 14, 1984. There is ample evidence to support a finding that Howell waived his rights under the Escrow Agreement.

To the extent that Howell's ninth point is an "insufficient evidence" point, we must examine all the evidence, including that which does not support the jury finding. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). If the evidence conflicts, the jury's finding should remain undisturbed. *Horvath v. Baylor University*

*Medical Center,* 704 S.W.2d 866, 868 (Tex. App.—Dallas 1985, no writ). The evidence that Howell did not waive his right to be paid from the escrow account consists of his protest letter of July 13, 1981, in which he objected to any release of funds from the escrow account. The same letter, however, also states that he would give the matter his "early attention." There is no evidence that Howell tried to obtain any survey before bringing suit, nearly two years after the Escrow Agreement. The jury's finding of waiver is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Fortner v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 687 S.W.2d 8, 12 (Tex.App. —Dallas 1984, writ ref'd n.r.e.).

Howell also argues that, as a matter of law, he had four years from the date of the Escrow Agreement in which to provide a survey. He reasons that the Escrow Agreement contained no deadline by which he had to provide a new survey, but that the statute of limitations for breach of a written agreement is four years. The rule, however, is that, when a contract specifies no time in which performance must occur, the performance must be within a reasonable time. *Maupin v. Dunn,* 678 S.W.2d 180, 183 (Tex.App.—Waco 1984, no writ). We conclude that the statute of limitations for suing under a written contract is irrelevant. The jury could well have concluded that Howell had been allowed a reasonable time before the release of the escrowed funds (and certainly before bringing suit) to obtain a new survey, and the jury could well have concluded that, by failing to do so, Howell waived his right to payment from the escrowed funds.

Howell also complains of the jury's finding that he was estopped from asserting his claim for damages for the extra square footage. Waiver arises when a party unilaterally relinquishes a legally enforceable right, while estoppel arises when a second party acts in accordance with that relinquishment, to the second party's detriment. *See Burton v. National Bank of Commerce,* 679 S.W.2d 115, 117 (Tex.App.—Dallas 1984, no writ). Once the jury had

concluded that Howell had unilaterally relinquished his right to be paid from the escrowed funds, it makes no difference whether it also concluded, rightly or wrongly, that Homecraft had suffered some kind of detriment from Howell's relinquishment of that right. Howell's ninth point of error is overruled.

■ In points of error six, seven, and eight, Howell argues that the trial court committed various errors in submitting issues on, and giving instructions on, the Brewer Survey. Howell views this case as a boundary dispute—whether the Brewer Survey or the Fincher Survey accurately depicts the square footage contained in the Property. The genesis of this dispute might well have been over the boundaries, but the purpose of the Escrow Agreement was to resolve that dispute. The record clearly reflects that, while Howell complained about the accuracy of the Fincher Survey, he did not mention the Brewer Survey during the earnest money contract negotiations, or at closing, or at any time until September 14, 1984.

The record also reflects that Howell had prepared several deeds, conveying the Property several times over, before Howell conveyed it to Homecraft; each time that Howell prepared those deeds, he used the identical metes-and-bounds description that was used in the deed conveying the Property to Homecraft. No one disputes that that metes-and-bounds description results in a mathematical calculation of the square footage of the Property that, as Howell admitted, corresponds very closely to the amount of square footage shown in the Fincher Survey. If Howell had timely provided the Brewer Survey in an effort to comply with the Escrow Agreement, the question whether the Brewer Survey is accurate might be appropriate. As it is, whether the Brewer Survey is accurate, or whether it operated as mutual conveyances among adjacent property owners in and around the Property, or whether a certain disclaimer clause to the Brewer Survey has any legal effect, or whether the Brewer Survey was validly recorded in the realty records of Dallas County, are all irrelevant.

There is no need to speculate on whether the Brewer Survey would have supported Howell's claim for payment for the extra square footage if Howell had timely provided the Brewer Survey; it suffices to point out that he did not timely provide it. Howell's points of error six, seven, and eight are overruled.

■ In point of error five, Howell argues that the trial court erred in not disregarding the jury's finding that Homecraft did not breach the Escrow Agreement. Howell also argues that, as a matter of law, Homecraft and Stewart owed him a fiduciary duty under the terms of the Escrow Agreement that they breached. Assuming, without deciding, that Howell was the beneficiary of a fiduciary duty imposed upon Homecraft and Stewart by the Escrow Agreement, Howell must still show that he suffered damages as a result of a breach of that fiduciary duty. *Newton v. Mallory*, 601 S.W.2d 181, *passim* (Tex. Civ.App.—Dallas 1980, no writ). Once Howell had waived his claim for damages from the conveyance of the extra square footage, he had waived his claim for payment from the escrowed funds. The entire purpose of setting up the escrow account was precisely to pay Howell for the claim of the extra square footage. It follows that any breach of the Escrow Agreement, once Howell had waived his claim for payment from the escrowed funds, resulted in no harm to Howell, irrespective of any fiduciary relationship created by the Escrow Agreement. Howell's point of error five is overruled.

■ In his point of error ten, Howell argues that the jury's finding of bad faith in filing his DTPA claim has no evidence, or alternatively insufficient evidence, to support it. The jury properly had the issue of Howell's bad-faith filing before it. *Fichtner v. Richardson*, 708 S.W.2d 479, 482 (Tex.App.—Dallas 1986, writ ref'd n.r. e.). Again, a "no evidence" point requires us to examine the evidence most favorable to the verdict, while an "insufficient evidence" point requires us to examine all the evidence, and reverse only if it appears that the verdict is so against the great

weight and preponderance of the evidence as to be manifestly unjust. *Fichtner*, 708 S.W.2d at 482.

To review the bad-faith finding, we must examine exactly what Howell's DTPA claims were. His allegations in his third amended original petition, containing the DTPA claims that went to trial, were that: (1) he had agreed to have Owen Ayres personally survey the Property, but Fincher was substituted in Ayres's place; (2) Stewart told him that Fincher was a partner of Ayres, when in fact Fincher was not; (3) Stewart told Howell that Ayres had rechecked Fincher's work, when Ayres had not; (4) Homecraft and Stewart threatened to sue Howell if the closing did not go through on April 10, 1981; (5) Howell was provided with real estate survey services and real estate settlement services that were not as represented; and (6) the escrow fund was released, with the purpose of "induc[ing] [Howell] not to secure another survey or otherwise attempt to establish a claim to the fund on deposit."

Howell himself admitted that he had never heard of Owen Ayres or his firm before the negotiations with Homecraft; in fact, when Howell received Homecraft's revised earnest money contract, he simply looked Ayres up in the yellow pages. There was testimony that Ayres himself was not even a surveyor, but an engineer; at the time that Fincher made his survey, Fincher was the only registered surveyor who worked for Ayres. There was no direct evidence of Fincher's status in Ayres's firm, although, since he had not been working for Ayres for very long before the closing, he was presumably not a partner. The record reflects no evidence at all that anyone ever told Howell that Ayres personally would recheck Fincher's work. The jury could reasonably have concluded that Howell's complaints about Fincher's work were trivial. The jury could also have concluded simply that, even if the Fincher Survey were not a good piece of work, Howell was never taken in by it in any case. The Escrow Agreement was set up, after all, to provide Howell an opportunity to provide a survey to controvert Fincher's work.

The jury could also have reasonably concluded that the release of the escrowed funds did not induce Howell to forego providing a new survey. The only evidence that Howell knew that the escrowed funds had been released before he brought suit was: (1) the June 30, 1981 letter in which Homecraft sought to get the funds released; and (2) Howell's own testimony of his telephone call to Stewart, when, Howell testified, he was told that the funds had in fact already been released. But the jury was free to disregard Howell's testimony, because he was an interested party. *Gomez v. Franco*, 677 S.W.2d 231, 236 (Tex. App.—Corpus Christi 1984, no writ). In any event, the jury could reasonably have concluded that Howell had brought suit precipitously, without even attempting to exhaust the opportunity for an amicable settlement that the Escrow Agreement was intended to provide.

Howell also testified that he was reluctant to spend $4,000 on a certificated survey, because his claim was for merely approximately $12,000. Howell also introduced testimony that his total attorneys' fees in the case had come to $66,675. The jury could reasonably have concluded that Howell was not easily intimidated by the prospect of litigation. We cannot say that there was no evidence to support the jury's finding of bad faith, or that that finding is so against the great weight and preponderance of the evidence so as to be manifestly unjust.

█ Finally, Howell argues that "bad faith" requires knowledge that one's actions are "wrong," and that he did nothing "wrong." If Howell means that he did nothing legally wrong, maybe so; but that is not the question. It is not illegal to file a suit, but, if that means that filing a DTPA action is never "wrong" and therefore never in bad faith, then section 17.50(c) of the Texas Business and Commerce Code is meaningless. The jury was not asked to, and did not, decide whether Howell did anything illegal. The jury could well have concluded, however, that filing a suit, without even attempting to settle the matter by providing a survey of his choice, was

"wrong." That conclusion, that Howell's actions were "wrong," was the sole prerogative of the jury. *See Fichtner*, 708 S.W. 2d at 482. Howell's tenth point of error is overruled.

■ In point of error eleven, Howell argues that the trial court erred in holding Howell's DTPA claim groundless. He asserts that a claim that survives a motion for directed verdict must be, as a matter of law, not groundless. In *Zak v. Parks*, 729 S.W.2d 875, 878 (Tex.App.—Houston [14th Dist.] 1987, no writ), the court rejected that very argument. It held that "[i]n making its finding that the suit is groundless, the trial court will consider undisputed fact issues, law issues or jury findings." 729 S.W.2d at 878. In fact, attorneys' fees awarded for defending against a bad-faith DTPA claim can be awarded only if the claim is brought in bad faith. Tex.Bus. & Comm.Code Ann. § 17.50(c) (Vernon Supp. 1987). Bad faith, however, is a question for the jury. *Fichtner*, 708 S.W.2d at 482. Therefore, attorneys' fees can be awarded only if a DTPA claim in fact goes to the jury for its consideration. It necessarily follows that a DTPA claim, in whatever faith it is filed, must be submitted to the jury's consideration or else attorneys' fees could never be awarded. We are persuaded by the reasoning of the *Zak* court, and hold that the survival of Howell's DTPA against a motion for directed verdict does not mean that the claim was not groundless. We also hold that, in this case, the undisputed fact issues, the law issues, and the jury findings all support the trial court's conclusion that Howell's DTPA claim was groundless.

■ In points of error one through four, Howell argues that the trial court should have granted his motion for new trial because of jury misconduct. On June 15, 1986, the Sunday before the jury began deliberating, an article had appeared in an editorial section of *The Dallas Times Herald*. The article bore the headline, "Howell sits on both sides of the bench." It mentioned that Howell was "raising eyebrows" at the courthouse because he was representing himself, *pro se*, as co-counsel to Pattison. (The article did not mention that Howell had obtained leave of the trial court to do so.) The article proceeded to quote Howell himself: "There's nothing wrong with it.... A judge can't hire out his services as a lawyer, but if he wants to go to court on his own case, that's *his* business." (Emphasis original.) It then quoted Robert Flowers, executive director of the Texas Commission on Judicial Standards, to the effect that he had never heard of a situation like Howell's before. Finally, the article conjectured what might happen if Howell were to appeal the case to his own court.

Two jurors, the only two who voted substantially in Howell's favor, provided affidavits at the hearing on Howell's motion for new trial. The affidavits stated, in identical language, that "[p]ractically all of the jurors who signed the charge saw and read [the article]." The affidavits did not state, however, that any juror was influenced by the article. The trial court concluded that jury misconduct had occurred, but that the misconduct was harmless.

One seeking reversal on grounds of jury misconduct must show that the misconduct was material and that it probably resulted in harm to him. *Baker Marine Corp. v. Weatherby Engineering Co.*, 710 S.W.2d 690, 692 (Tex.App.—Corpus Christi 1986, no writ). Additionally, the trial court's overruling of a motion for new trial will be reversed only if the trial court abused its discretion. *Baker Marine Corp.*, 710 S.W. 2d at 692; *see also Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex.1984). Howell offered no evidence at all that the newspaper article in any way affected the result of the jury verdict. *See Macias v. State*, 733 S.W.2d 192, 193–94 (Tex.Crim.App.1987) (en banc) (a death sentence imposed by jurors when some veniremen had read a newspaper account of the case was affirmed, because the defendant could make no showing that the account influenced any juror). We cannot say that, in this case, the trial court abused its discretion by refusing to set aside a civil monetary judgment, in the absence of any showing that the newspaper

article actually swayed any juror in the decision.

In addition, the jury had sat through a trial two weeks long before it began its deliberations; it heard ample testimony from a number of witnesses, including Howell himself. There is no reason to believe that the impressions formed by the jury, after two weeks of testimony, were altered by a brief article, which told the jury only what it had already seen: that Howell was acting as an attorney in his own case. Finally, the article itself says nothing really derogatory about Howell. It makes no conclusions about the impropriety of Howell's self-representation, and the only party to the suit quoted in the article is Howell himself. We cannot say, under all the circumstances, that the trial court abused its discretion in overruling Howell's motion for new trial.

Howell also argues, however, that Homecraft, Stewart, or their attorneys affirmatively conspired to "plant" the article in the newspaper, with the intent to sway the jury. He concludes that, since his adversaries actively tampered with the jury, the trial court should have applied a stricter standard and should have granted a new trial. Howell offered into evidence, to support this claim, only his affidavit, filled mostly with his own conclusions and speculations. On the other hand, Howell himself argues, in his own brief, that merely talking with a newspaper reporter is no guarantee that an article would be read:

> Dallas County has two principal newspapers and several smaller ones. Few people read a metropolitan daily from end to end; some subscribers never get around to reading it at all; a certain number of people don't even buy a newspaper. Also, the article appeared on page 37A, not an extremely prominent place. Considering all of these factors, it was doubtful if, at most, more than one or two jurors, acting independently, would have read the article.

But if Howell had no way of knowing that his own remark (which he himself made to a newspaper reporter) would actually be read by anyone on the jury, he cannot argue that his adversaries had any other way of knowing that their efforts would bear any better fruit. We conclude that Howell's arguments that his adversaries were in a position to tamper knowingly with the jury lack merit. Howell's points of error one, two, and four are overruled.

Howell argues further, in his third point of error, that the trial court erred in quashing certain subpoenas that Howell had issued. Howell had attempted to serve certain employees of the newspaper, the day before the hearing on his motion for new trial, to compel them to testify as to what they knew of the genesis of the article. On the morning of the hearing on Howell's motion for new trial, Howell and a process server also attempted to subpoena some chief executive officers.

The record is very clear, however, that Howell was attempting to accomplish substituted service. The rules require a strict showing of the need for substituted service, and the trial court must order the substituted service. *See* Tex.R.Civ.P. 109a; *In re Marriage of Peace*, 631 S.W.2d 790, 792 (Tex.App.—Amarillo 1982, no writ) (plaintiff must show reasonable diligence in locating whereabouts of defendant, and trial court must make its own inquiry into plaintiff's diligence). Howell made no showing that he had exercised due diligence in serving the people that he wanted served, and never moved the trial court for leave to use substituted service. Therefore, the trial court properly quashed the subpoenas. Howell's third point of error is overruled.

In his final point of error, Howell argues that the trial court erred in awarding Homecraft attorneys' fees under its DJA counterclaim. The trial court had awarded Homecraft $75,000 in attorneys' fees upon the jury's finding that that was a reasonable amount to compensate Homecraft for defending against Howell's DTPA claim, but the trial court also awarded an additional $12,000 in fees, upon its own finding that that was a reasonable amount to compensate Homecraft for prosecuting its own DJA claim against Howell. We

agree with Howell that the additional award was error.

The amount of attorneys' fees is a fact question for the jury. *Travelers Insurance Co. v. Medi–Rents, Inc.,* 687 S.W.2d 499, 501–02 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Failing v. Equity Management Corp.,* 674 S.W.2d 906, 910 (Tex.App.—Houston [1st Dist.] 1984, no writ). The DJA specifically provides that:

> If a proceeding under this chapter involves the determination of an issue of fact, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

Tex.Civ.Prac. & Rem.Code Ann. § 37.007 (Vernon 1986). We conclude that Howell was entitled to have the amount of attorneys' fees awarded to Homecraft determined by the jury. Homecraft, however, failed to request a jury issue on the amount of attorneys' fees in connection with its DJA counterclaim; the issue that it did request was limited solely to fees in connection with the defense of Howell's DTPA claim. Because no issue concerning Homecraft's counterclaim was submitted to the jury and because Homecraft sought affirmative relief in that counterclaim, its claim for attorneys' fees for prosecuting that claim was waived. Tex.R.Civ.P. 279; *see also Indust–Ri–Chem Laboratory v. Par–Pak Co., Inc.,* 602 S.W.2d 282, 297 (Tex.Civ.App.—Dallas 1980, no writ). Accordingly, and without addressing the other arguments that Howell urges in this point, we sustain Howell's twelfth point of error.

The judgment of the trial court is modified to delete the award of attorneys' fees under Homecraft's DJA counterclaim. The award to Homecraft of only those fees awarded for defending against Howell's DTPA claim remains. The judgment of the trial court, as modified, is affirmed.