**NORTH AMERICAN VAN LINES OF TEXAS, INC., Appellant,**

v.

**Nancy BAUERLE, Appellee.**

**No. 2–83–188–CV.**

Court of Appeals of Texas,
Fort Worth.

Sept. 13, 1984.

Jackson, Walker, Winstead, Cantwell & Miller and William Charles Bundren, Dallas, for appellant.

Law Offices of Art Brender and Art Brender, Fort Worth, for appellee.

Before HUGHES, ASHWORTH and HILL, JJ.

## OPINION ON MOTION FOR REHEARING

ASHWORTH, Justice.

North American Van Lines of Texas, Inc., appealed the Deceptive Trade Practices Act judgment rendered against it and in favor of Nancy Bauerle (now Nancy Campbell) for actual damages plus two times actual damages in the total sum of $1,425.00, plus attorney's fees.

Our original opinion was issued in this cause on June 21, 1984. In that opinion we reversed that part of the trial court's judgment allowing the double penalty and affirmed the judgment as to the actual damages and attorney's fees.

Appellee filed her motion for rehearing on June 29, 1984 arguing that this court erred in holding the letter notice of June 25, 1980 did not set out her complaint with sufficient specificity to comply with TEX. BUS. & COM.CODE ANN. sec. 17.50A (Vernon Supp.1984). Appellant filed its motion for rehearing on July 6, 1984. In its motion, appellant sets forth fourteen points of error. In points one through seven, appellant re-urged its seven original points of error. In points eight through fourteen appellant asserted in essence that since this Court held the notice to be insufficient, appellee was barred from any recovery.

We are convinced that appellee's contention that the notice was sufficient is well-founded; therefore, the original opinion and judgment are withdrawn and the following opinion and judgment are substituted.

Judgment affirmed.

Plaintiff sued for damages to her piano, which occurred while defendant's workmen were moving it from Austin to Fort Worth. The piano fell off the dolly in the final phase of the move (in her living room) and was damaged in the fall. The damage consisted of scratches, loss of veneer and wood and a damaged keyboard. Defendant admits the damage (but not the amount thereof) and that the move was pursuant to a contract between plaintiff and defendant.

Plaintiff's claim for damages was paid by defendant on all items but the piano. They could not agree on the amount.

Plaintiff's attorney wrote defendant the following letter:

ART BRENDER

Attorney at Law

930 Bank of Commerce Bldg.

7th & Throckmorton

Fort Worth, Texas 76102

_____

Phone (817) 334–0171

June 25, 1980

North American Van Lines of Texas
811 South Central Expressway Suite 349
Richardson, Tx. 75080

Dear Sir/Madam:

Please be advised that I represent Nancy Bauerle in connection with her claim for damages caused to several of her articles

during her recent move in January of this year from Austin to Fort Worth. As you are well aware she filed a statement of claim with your office on March 10th duly notarized and acknowledged requesting the sum of $1180.00 to cover the cost of the articles which were damaged and listed on the claim form. I am enclosing a copy of the statement of claim together with the estimates provided your firm at the time the claim was made. I am also enclosing herewith a copy of the household goods bill of lading and freight bill stating that the total value of the goods was $40,000 and that they should thus have been properly insured. As of the date of this letter the claim has still not been paid. Unless this claim is paid in full within thirty (30) days from the date of this letter I will have no alternative other than to file suit under the Texas Deceptive Trade Practices Act and Article 21.21 of the Texas Insurance Code for false, misleading and deceptive acts in the course of trade or commerce and for violation of expressed and implied warranties made to my client in connection with the above mentioned services. In addition a reasonable attorney's fee in the sum of $300.00 is hereby requested. Unless the actual damages suffered by my client and a reasonable attorney's fee are paid within the above mentioned thirty (30) day time limit we will have no alternative other than to file suit. I will look forward to hearing from you in the near future in the hopes that we can avoid litigation in this matter. Very truly yours,

/s/ART BRENDER

(The "Statement of Claim" cited therein as being attached thereto listed $65.00 damage to a chair, $1,115.00 damage to a baby grand piano and $15.00 estimate fee for piano.) Suit was filed on November 17, 1980.

Plaintiff testified that defendant assured her they would be able to provide people who had experience as piano movers. Further she asserted that she paid defendant an extra $25.00 above the cost of the move to insure her having such qualified personnel. This was in addition to paying for additional insurance over and above the moving charge. The bill of lading, introduced without objection, reflects "Straight Shipments" charges of $607.38, plus other items which specifically included "Hoisting or piano carry 25.00."

Plaintiff testified that her goods arrived at ten or eleven o'clock on the morning of January 9, with only the truck driver present. The driver stated that some more people would be coming. In the nearly six hours of waiting for the movers to come, plaintiff and the driver moved everything from the van to the house except the piano and the furniture. Three or four people showed up at four or five o'clock and moved the furniture into the house. One of the last items moved in was the piano. Plaintiff described their handling of the piano:

They unloaded it from the van, they moved it down the sidewalk and into the house, into the living room, and that's where it was to be unloaded; and, it was at that time that the men were around it, and were taking it off the dolly to set it up, and that was the time, and the accident occurred when they dropped it off the dolly, and the padding slipped, and then it scraped along the side of the dolly, and onto the floor, to the living room floor.

\*   \*   \*   \*   \*   \*

Q. All right. Can you describe the jolt or the jar that you just mentioned?

A. Well, it had about a six or seven inch drop from the dolly to the floor, it was that kind of jolt.

Q. And, can you describe how these movers went about moving the piano in terms of their actions and their appearances, whether they appeared to have done this before, or not, and that sort of thing?

A. Well, I don't know if they had done it before. There were about four or five of them then, because the driver was still there, and they gathered around the piano there in the living room, and were

handling it in various ways trying to just get it off the dolly, and get it installed properly, or upright, properly.

Q. Were they talking to one another while they were doing this?

A. Yes.

Q. Did their—what sort of conversation—

A. —Going back and forth and, "You get over here, be careful there, watch it", and I don't remember their exact words, but there was conversation taking place.

Q. All right. From their conversations and their actions did they appear to be experienced piano movers?

A. No.

Q. Have you seen experienced piano movers move a piano?

A. Yes, I have.

Q. Can you—on what occasions have you seen that?

A. Well, when the piano was moved to Austin from San Antonio when I first got it, it was handeled [sic] properly, and then again when I moved from Fort Worth back to Austin, again the piano movers—

Q. —Who handled that move?

A. The Fort Worth Piano Restoration Company.

Q. And, who was the gentleman that you had doing this?

A. Ben Herring, and his helper.

Q. All right. How many people did it take when Ben Herring moved the piano—were you there when he—

A. —Yes, I was there. Two.

Q. And, how did they handle the piano differently than the way it was handled on the occasion you've just described?

A. Well, it was just handled very efficiently, they used the—they did not use the weight of the piano against them, they used it to balance it, put it upright into the dolly, pad it securely, and just everything about it. There were no questions going back and forth, or problems with it at all, it was just very nicely handled—

Q. —Was anybody really having to strain to—

A. —Oh, no, no. You see they used the piano to their advantage, not disadvantage.

Q. They used the leverage—

A. —The leverage, uh-huh.

Q. Did the piano movers that moved your piano for North American Van Lines of Texas in January of 1980, did they use leverage to move the piano in the way that you had seen it moved—

A. —Not the way I had seen it moved later on, or even before.

Q. All right. And, was it a precarious manner in which it handled the piano?

A. Yes.

Mr. Ben Herring testified on piano moving as follows:

Q. ... I believe you did have occasion later on to actually move that piano when it was being moved back to Austin, or to Austin from Fort Worth, is that correct?

A. Yes, sir.

Q. What sort of steps do you take, or should you take in carefully moving a piano like that so as to avoid damage to it?

A. With a grand piano, of course, the legs, the three legs and the pedal have to be removed in order for the grand to be set down on it's [sic] flat side, either on a piano dolly, or on a grand board, and we remove the left front leg, and set the cabinet down on a dolly, and then tipped the whole thing up on its flat side on the dolly, remove the remaining two legs, and then they are ready to be moved.

Q. All right. Now, you mentioned a "grand board", what is that?

A. A grand board is nothing more than just a long flat board, roughly eight to twelve inches wide, and in most cases, on for example a new piano, or a freshly finished grand, we will use a grand board in order to ensure that we don't do any damage to the flat side of the piano.

Q. All right. And, what do you do, do you have any precautions you take with regard to the dolly in the event the piano would slip and slide off the dolly?

A. My dolly is rubber padded so that it neither scratches nor slips.

Q. Uh-huh. It would prevent if [sic] from slipping—

A. —Yes, sir—

Q. —because this rubber would hold, and present [sic] friction. Is—do—what type physical, or whatever, does it take with regard to moving the piano? By that I mean,—let me ask it this way: First of all, what do these pianos generally run, weigh in terms of weight?

A. Any where—a small grand like this, probably five hundred to eight hundred pounds, somewhere in that range.

Q. Okay. And, you obviously are not able to lift that amount of weight, is that correct?

A. Yes, sir.

Q. How many people does it take to move one of these?

A. Two people on a piano that size.

Q. Okay. And, is it necessary to use leverage and that sort of thing in order to do the work?

A. Oh, yes.

Q. Does it take a certain amount of knowhow and knowledge in order to move one of those without a great deal of stress and strain?

A. Yes, sir.

Q. Have you ever seen inexperienced people attempt to move a piano of that sort?

A. Yes, sir.

Q. Do they have to work at it a lot harder *than somebody that knows what they're doing?*

A. Yes, sir, they do. It has been my experience that you make up for *lack of knowing how* to do it by the number of people, or the number of muscles that you have there.

Q. We pass the witness, Your Honor. [Emphasis added.]

Points of error one through six allege error by the trial court in its finding of facts that defendant's employees and agents lacked skill and expertise, and that defendant represented to plaintiff that defendant would provide movers with a high degree of skill and expertise. Defendant asserts that these findings are in error because there is no evidence and insufficient evidence to support such findings. Further, defendant states that the findings are so against the great weight and preponderance of the evidence that they are manifestly unjust.

The trial court had before it the testimony of the plaintiff as to what representations were made to her by defendant's agents as to the expertise of the people who would move her piano. Her testimony was not controverted. Was her testimony sufficient to sustain trial court's finding? Defendant admits in its brief that movers with skill and expertise were promised, but challenges the trial court's finding that such skill and expertise would be of a high degree.

Plaintiff's testimony in regard to expertise promised was:

Q. ... In other words, how did you happen to select North American Van Lines to be your mover?

A. Well, in the fall I contacted several different van lines, North American being one, and they had an Austin agent that came out and gave me an estimate for my move.

Q. Okay. And, when you—did you contact other moving companies as well as North American?

A. Yes, but they were the only ones that came out.

Q. All right. When you contacted these moving companies, were you looking for a particular—or, did you have in mind a particular purpose, or some particular articles of your furnishing or belongings that you wanted treated in a particular, special way?

A. Yes. My major concern was a Baby Grand Piano that I had, and I wanted to make sure that that would be han-

dled properly, and that they had experienced people to accomodate that, and get it moved for me.

Q. Experienced piano movers?

A. Yes.

Q. All right. And, when you made inquiry of the other van companies, did you—did you make inquiry of them as to whether they had experienced piano movers?

A. Yes.

Q. All right. Was that also a question that you asked North American Van Lines of Texas?

A. Yes.

Q. All right. And, the—okay.

And, did you ultimately enter into a contract with North American Van Lines of Texas for the—I think it's of Texas, Incorporated, for moving your furniture from Austin to Fort Worth?

A. Yes.

Q. All right. And, did—what were you told when you inquired as to the availability of experienced piano movers to move your piano?

A. Yes, that they would be able to provide people that did have that experience, in fact I could even sign and pay for that handling fee that, you know, I don't know if it's called insurance, but I paid twenty-five dollars extra above the cost of the move, to insure that I would have qualified personnel.

Q. All right. Now, you did take out an insurance policy also, did you not?

A. Yes, I did.

Q. All right. Was that in addition to the—was there an additional charge made for the insurance over and above the moving charge?

A. Yes. I was explained—this was explained to me at the time the lady came out to my house to give me an estimate for the move, and she told me that normally you were allowed sixty cents per pound valuation for your goods, and that if I wanted to insure it above that cost that I would take out an insurance policy, or that I would sign in the appropriate section of the forms, and

value what I considered my possessions were worth, and then to sign it, so I did so, I valued it at forty thousand.

Q. Okay. Now, this charge though was not the same charge you paid for the expert piano movers to move your piano, was it?

A. No, this was in addition.

Q. All right. In other words, was there also a charge made as a part of the moving charges for moving your piano? That was the twenty—

A. —Yes, the twenty-five—

■ We have not been able to find in the record where the words "high degree of skill and expertise" appear in connection with the promise of defendant "to provide experienced piano movers" to move plaintiff's piano. The promise as testified by plaintiff was for "experienced" piano movers. That is what she paid $25.00 for: "experienced" piano movers. We hold that the trial court had before it testimony that justified its finding that plaintiff did not receive what she paid defendant $25.00 to furnish.

■ Even though the record does not reveal the names, social security numbers or work records of the five or so workmen who "muscled" the piano into plaintiff's abode without using a "grand board" or rubber padded dolly, we hold that plaintiff's testimony describing their ineptness and uncertainty was sufficient for trial court to mark them as not experienced. Mr. Herring's testimony as to proper use of dollies and grand boards, coupled with his long experience in piano moving was sufficient to set a standard upon which the trier of fact could make a decision. We hold that the "high degree of skill and expertise" finding, while exaggerated in Finding of Fact number 5, nonetheless is sufficient basis for Finding of Fact number 6. There was sufficient testimony that defendant did not provide movers with the degree of skill it promised.

■ We are required to presume the trial court's fact findings are correct when they are supported by any competent evi-

dence and not against the great weight of evidence. *Jackson v. Lone Star Plywood and Door Corp.*, 652 S.W.2d 830 (Tex.App. —Fort Worth 1983, no writ).

We overrule points of error one through six.

Defendant, in its points of error seven through thirteen asserts error by the trial court:

In failing to find that:

7–9 Plaintiff did not give defendant written notice of plaintiff's specific complaint against defendant 30 days before filing suit and rendering judgment thereon for the reason that there is (7) no evidence, (8) insufficient evidence and (9) such insufficiency of the evidence as to make the court's refusal to so find manifestly wrong and unjust.

In rendering judgment for plaintiff under the Deceptive Trade Practices Act because plaintiff:

10. Failed to have, and did not give written notice of plaintiff's specific complaint against defendant 30 days before filing of the suit, and

11. Failed to give defendant written notice of plaintiff's complaint against defendant about misrepresentations of Rue Ann Harrington found by the trial court, with a fatal variance between fact finding of the trier of fact and the written notice given by plaintiff.

In concluding that, as a matter of law: 12. The notice provision of the Deceptive Trade Practices Act in effect in 1980 was an affirmative defense and that defendant's failure to plead, lack of sufficient notice was ground for rendering judgment for plaintiff. In rendering judgment for plaintiff because plaintiff's only claim was under the DTPA and she failed to comply with the statutory requirements of such act in this case.

In essence, points of error seven through thirteen all complain of the sufficiency of the notice given defendant in the letter from plaintiff's attorney to defendant (set forth above). In this we are concerned only with whether it was specific enough to advise defendant of plaintiff's complaints. There is no question of timeliness of the notice or whether it was received by defendant.

■ The letter with its attachments was certainly specific enough to put the defendant on notice of plaintiff's damages. The claim form attached described the baby grand piano and its damage in some detail: "Entire side of piano scraped, scratched, part of veneer missing." In the "Amount Claimed" column was the sum of "$1115.00," also "Estimate fee for piano $15.00." Further, a notation: "Total accurate-provided the damage of the keyboard of piano (action) is not more severe—see attached letter." Defendant was put on notice that a Deceptive Trade Practices Act suit was contemplated if damages were not paid and that attorney's fees of $300.00 would be demanded. With regard to the specificity of the complaint, plaintiff's letter stated that defendant committed "false, misleading and deceptive acts in the course of trade or commerce" and violated "expressed and implied warranties ... in connection with the above mentioned services." The letter makes it clear that the claim is being made for damages to the goods while being shipped and states that appellant is guilty, among other things, of a violation of implied warranties.

■ The notice provision of the DTPA does not require the written notice to allege a cause of action or to threaten a lawsuit. *Chrysler Corp. v. Roberson*, 619 S.W.2d 451, 461 (Tex.Civ.App.—Waco 1981, no writ). In *Barnard v. Mecom*, 650 S.W.2d 123, 127 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.) the court stated that "Section 17.50A(a) does not require a complaining consumer to threaten suit under the DTPA or specify which section he thinks is violated." The purpose of the notice requirement is to inform the seller of the consumer's complaint and thus provide an opportunity for the parties to settle the matter without litigation.

Section 17.44 of the DTPA provides that the Act

be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

TEX.BUS. & COM.CODE ANN. sec. 17.44 (Vernon Supp.1984).

We hold that the notice was sufficient to meet the requirements of sec. 17.50A with the meaning and purpose of that statute, and appellee is entitled to recover the punitive damages provided. Points of error seven through thirteen are overruled.

We also overrule point of error fourteen which asserts error of the trial court in disregarding the Texas Railroad Commission tariff controlling the act and conduct of the defendant which also limits defendant's liability based upon *contracts for the carriage of goods*. Defendant urges that this tariff conflicts with the DTPA, and that the tariff is more specific than the DTPA as to contracts for carriage of goods and should preempt the more general provisions of the DTPA. *Bank of Texas v. Childs*, 615 S.W.2d 810 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.), *injunction granted*, 634 S.W.2d 2 (Tex.App.—Dallas 1982); *Farmland Industries, Inc. v. Moore*, 596 S.W.2d 939 (Tex.Civ.App.—Waco 1980, no writ); *Sam Bassett Lumber Co. v. City of Houston*, 198 S.W.2d 879 (Tex.1947).

■ Plaintiff answers that tariff has nothing to do with this lawsuit: that it is the *misrepresentation* that gives rise to the DTPA action here on appeal, not whether the tariff is a required or limited charge. Plaintiff filed this suit solely as a DTPA action and based her claim on the misrepresentation which the trial court found and upon which damages were assessed. We agree.

Judgment affirmed.

HUGHES, Justice, dissenting on motion for rehearing.

I respectfully dissent.

As the majority noted, plaintiff's letter simply stated that defendant committed "false, misleading and deceptive acts in the course of trade and commerce" and violated "expressed and implied warranties ... in connection with the above mentioned services." TEX.BUS. & COM.CODE ANN. sec. 17.50A (Vernon Supp.1984) requires that the plaintiff inform the defendant of his "specific complaint" before filing suit. Alleging that someone committed false, misleading and deceptive acts in the course of trade and commerce and violated expressed and implied warranties does not advise the defendant of the specific complaint. The notice should include which warranties were violated and what the false, misleading and deceptive acts were.

I would hold that since the notice does not meet the requirements of sec. 17.50A, plaintiff should be precluded from recovery of punitive damages. *Jim Walter Homes, Inc. v. Geffert*, 614 S.W.2d 843 (Tex.Civ. App.—Corpus Christi 1981, writ ref'd n.r. e.).