**U.S. STEEL CORPORATION, Appellant,**

v.

**FIBEREX, INC. and Plas–Tex, Inc., Appellees.**

No. 05–87–00109–CV.

Court of Appeals of Texas, Dallas.

May 16, 1988.

Rehearing Denied June 20, 1988.

Frank Finn, Judy Norris, Dallas, for appellant.

Roger D. Higgins, Larry Hallman (Fiberex), Joann N. Wilkins (Fiberex), Dallas, for appellees.

Before DEVANY, LAGARDE and THOMAS, JJ.

THOMAS, Justice.

Appellee, Fiberex, Inc., sued appellant U.S. Steel Corporation and appellee, Plas–Tex, Inc., alleging that polyester resin manufactured by U.S. Steel and sold by Plas–Tex caused delamination in certain swimming pools built by Fiberex. Plas–Tex asserted a cross-claim against U.S. Steel for contribution and indemnity. U.S. Steel, asserting twenty-four points of error, appeals an adverse jury verdict finding it liable for breach of implied warranty and for violation of the Deceptive Trade Practices Act (DTPA). Because we agree that the evidence did not support a finding: (1) that the resin manufactured by U.S. Steel was unfit for its ordinary purpose, and (2) that the unfit resin manufactured by U.S. Steel proximately caused delamination in the pools manufactured by Fiberex, the trial court's judgment is reversed and the cause remanded for a new trial. In addition to discussing the points of error which form the basis of the reversal, we will also address the points necessary to aid in the trial upon remand.

## FACTUAL STATEMENT

Fiberex is a manufacturer of fiberglass swimming pools. During the years 1980 and 1981, Fiberex purchased certain polyester resins from Plas–Tex, a distributer. Most, but not all, of the resins purchased in those years were manufactured by U.S. Steel. Beginning in the latter part of 1980, delamination began appearing in some pools. By the spring of 1981, Fiberex realized that delamination had become a significant problem after approximately thirty-four pools delaminated. During 1981 and 1982, Fiberex endeavored to repair the pools which had delaminated.

The resin subject to this suit is designated as MR12214, a general purpose resin. U.S. Steel manufactures other resins, and the record shows that Fiberex used several different types of resins during the relevant period. Fiberex kept no records as to which types of resin were used in the manufacture of the delaminated pools.

## STATUTORY BASIS FOR CAUSE OF ACTION

Fiberex brought its claim of breach of warranty under Sections 2.314 and 2.315 of the Texas Business and Commerce Code (UCC) and section 17.50(a)(2) of the DTPA. Section 17.50(a)(2) allows consumers to maintain an action when a breach of an implied warranty constitutes a producing cause of actual damages. Section 2.314 of the UCC requires that in order to prevail on a breach of implied warranty of merchantability, a plaintiff must establish that the product in question was not fit for the ordinary purposes for which it was used. TEX.BUS. & COMM.CODE ANN. § 2.314(b)(3) (UCC) (Vernon 1968).

## ARGUMENTS BY U.S. STEEL

U.S. Steel argues that the judgment in favor of Fiberex was improper because Fiberex failed to prove that the resin in question had a defect per se, but rather only showed that the resin did not laminate. While the ordinary purpose of a resin is to bond materials, U.S. Steel argues that Fiberex must nonetheless prove that the resin had a "defect" rendering it unable to laminate. It is contended that Fiberex offered no evidence of a defect causing the resin to be unfit, other than the fact that the resin failed to bond.

Further, U.S. Steel points out that Fiberex did not complain that all MR12214 produced or manufactured by U.S. Steel was unfit; rather, Fiberex complained that certain unidentified batches of MR12214 used by Fiberex on certain unidentified pools was defective. Because Fiberex also admitted it had no batch records and could not testify as to which batches were allegedly unfit, U.S. Steel maintains that the product in question is unknown and that Fiberex did not meet its burden of proving that the particular resin used by Fiberex on the delaminated pools was unfit when it

left the possession of U.S. Steel. Further it is U.S. Steel's position that Fiberex's method of production, or the use of a wax-containing resin, recommended by Plas–Tex, caused the delamination.

### ARGUMENTS BY FIBEREX

Fiberex maintains that all it was required to prove in order to recover for breach of implied warranty was that the product in question was not merchantable or fit for the purpose for which it was intended at the time of manufacture of the product. Fiberex contends that it established that MR12214 was a general purpose laminating resin which was represented to be appropriate for the building of large fiberglass parts such as swimming pools. Laminating resin is a general all purpose resin with its ordinary purpose being to bond materials together. Since the resin in question failed to bond, such failure renders the resin "defective". Thus, argues Fiberex, the evidence before the jury shows that the resin manufactured by U.S. Steel was not fit because it did not do what it was intended to do, and this is sufficient evidence to support the jury findings.

Fiberex further argues that there is direct and circumstantial evidence which shows that the resin was defective and deficient at the time it left U.S. Steel. The evidence revealed that Plas–Tex received the resin in sealed barrels which it then shipped without alteration. The batch records showed some batches of resins were out of specifications and contained rework or ODD lot[1] material.

Moreover, the circumstantial evidence demonstrates that delamination occurred and that delamination should not occur unless the resin used is unfit or defective or the application technique was improper. Since, according to Fiberex, the evidence

demonstrated that the application techniques used were proper, a logical inference is that the delamination occurred because of defective resin.

### STANDARD OF REVIEW

█ In points of error one, two, and three, U.S. Steel asserts that there is legally and factually insufficient evidence to support the jury's finding that any resin manufactured by it was unfit for its ordinary purpose, or that such a finding by the jury was against the great weight and preponderance of the evidence. In points of error four, five and six, U.S. Steel again urges a three-fold argument against the sufficiency of the evidence to support a finding that any unfit resin manufactured by U.S. Steel proximately caused delamination in any Fiberex manufactured pool. A "no evidence" point presents a question of law. In deciding that question, we must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. If a "no evidence" point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for the appellant unless the interests of justice require another trial. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In reviewing factual insufficiency contentions, we consider all of the evidence in the record that is relevant to the fact being challenged, including any evidence contrary to the judgment. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). We may not substitute our judgment for that of the jury where there is some evidence of probative value which is not so against the great weight and preponderance of the evidence as to be manifestly unjust.[2] *See Horvath*

---

**1.** Rework is overage material from another batch or out of specification batch which is blended. ODD lot is a series of different materials, odds and ends of production runs which are blended together.

**2.** More precisely, an insufficient evidence point requires only considerations of the evidence tending to support a fact, while a great weight point requires a consideration of all of the evi-

dence; as a practical matter, however, both points are treated alike by Texas courts. Thus, we shall simultaneously apply our analysis and disposition to both the insufficient and the great weight points. *See* Cornelius, *Appellate Review of Sufficiency of the Evidence Challenges in Civil and Criminal Cases,* 1983 TEX.B.J. 439, 441, *and compare, Ford Motor Company v. Tidwell,* 563 S.W.2d 831, 837 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.) (on motion for rehearing).

*v. Baylor University Medical Center*, 704 S.W.2d 866, 870 (Tex.App.—Dallas 1985, no writ); *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 836 (Tex.App.—Dallas 1984, writ ref'd n.r.e.) (overruled on other grounds).

## FITNESS FOR ITS ORDINARY PURPOSE

The parties disagree on what establishes proof that the resin was unfit for ordinary purposes, and if unfit, whether such condition was the proximate cause of the delaminated pools. Thus, in our review we must examine the meaning of "unfit" as contemplated by Section 2.314 of the UCC.

Fiberex relies upon *Bernard v. Dresser Industries, Inc.*, 691 S.W.2d 734, 738 (Tex. App.—Beaumont 1985, writ ref'd n.r.e.) to support its position that 1) it is not necessary to show a defect but only that the resin was unfit for its ordinary purposes, and 2) circumstantial evidence is adequate to show that the resin was defective at the time it left U.S. Steel's possession. *Dresser* was a breach of implied warranty case involving a plaintiff who suffered injuries while testing a length of pipe with a pressure gauge manufactured by the defendant. While it is true that *Dresser* holds that proof of a defect is not necessary in a breach of implied warranty cause of action, the opinion also states that circumstantial evidence is adequate to show a product to be defective.[3] The court concludes that, notwithstanding their holding, there was both direct and circumstantial evidence in the record to show the gauge to be *defec-*

3. Moreover, *Dresser* is a personal injury case brought under the UCC and is part of the continuing endeavor in Texas courts to reconcile personal injury actions based on breach of warranty with actions for strict products liability. *Dresser*, 691 S.W.2d at 737. Because this appeal does not involve personal injuries, *Dresser* can be distinguished.

4. We stress at the outset that the record shows *only* that several batches which went to Plas-Tex were "out of specification". The record *does not* show that any of those batches were actually part of Fiberex's inventory and then used in the delaminated pools. Further the evidence was inconclusive on whether such res-

*tive* and deficient. *Dresser*, 691 S.W.2d at 738.

In finding the evidence sufficient to support the jury's findings on breach of implied warranty of merchantability, the *Dresser* court described what was "direct, abundant evidence in the record which glaringly demonstrates that the gauge malfunctioned at the time the expansion joint exploded." *Dresser*, 691 S.W.2d at 738. There was no evidence of any other possible cause or explanation for the explosion and no evidence of mistreatment of the gauge. In fact, the evidence tended to show that the gauge was in the same condition as it was when it left the manufacturer's possession and was properly handled during use. Perhaps most significant is that the product in question, namely the pressure gauge, was readily identifiable in that it was the precise object alleged to be unfit. Fiberex does not provide us with a similar record.

The instant case presents a different set of circumstances. The evidence revealed that Fiberex manufactured 100 to 400 pools annually using U.S. Steel's resins. Between mid–1980 and mid–1981, approximately 34 pools allegedly using MR12214 delaminated. Even taking as true that U.S. Steel sent to Plas–Tex some batches that did not meet technical specifications and may have contained excessive wax,[4] we are still faced with the initial unanswered questions of whether any of that resin reached Fiberex and then whether it ultimately was used in the pools which delaminated. Unlike *Dresser*, we do not know which resin is the specific resin which is

in was rendered defective or only "inconsistent" when it did not meet the specifications. There was also inconclusive evidence on whether "out of specification" meant that the resin was no longer a general purpose resin or possibly only an inappropriate resin for use in manufacturing pools.

The evidence additionally tended to show that the more wax a resin contains the more effect it has on the resin's ability to bond. There was, however, no evidence that the resin argued to be unfit did in fact contain excessive wax; the evidence suggested only that this was a possibility and *could* have been the cause of delamination.

allegedly unfit. We do know Fiberex used more than one type of resin during the relevant time period. Fiberex would suggest that under the holding of *Dresser*, we are to end our analysis at this point since it is unnecessary for Fiberex to prove anything more than the the the fact that the resin failed to bond.

We question the application of *Dresser* to this case, particularly since *Dresser* cites no authority in holding that it is not necessary to show a defect in the product. *Dresser* does cite to *Darryl v. Ford Motor Company*, 440 S.W.2d 630, 632 (Tex.1969) for the rule that circumstantial evidence is adequate to show that a product was *defective* at the time it was sold or left the possession of the manufacturer.[5] While the *Dresser* court holds that proof of a defect is unnecessary for breach of implied warranty claims, it nonetheless utilizes the rule regarding use of circumstantial evidence in proving a defect and subsequently proceeds in its opinion to summarize such evidence from the record. *Dresser*, 691 S.W.2d at 738. We do not read *Dresser* to say that absent the kind of direct and circumstantial evidence shown in that record that a plaintiff is free from proving a defect; on the contrary, we understand it to mean that a defect may be proved through the circumstances.

Even *Darryl*, a strict liability action, cited to by the *Dresser* court, stated that circumstantial evidence should not be excluded and direct evidence would not be required to rebut "all of the conceivable possibilities which would account for the defective condition other than the existence of a defect at the time of the sale." *Darryl*, 440 S.W.2d at 632–33. Under the facts in that case, though, as in *Dresser*, the court acknowledged that there was no other explanation in the record for the cause of the accident. As discussed below, U.S. Steel did present other possibilities to explain the delamination problem.

We hold that in this action grounded on implied warranty, Fiberex had the burden of proving that the resin was defective at the time it left U.S. Steel's hands and that Fiberex could attempt to meet this burden circumstantially. *See Fitzgerald v. Caterpillar Tractor Company*, 683 S.W.2d 162, 164–65 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.) (personal injury action brought under breach of implied warranty, stating that not only is proof of a defect required but that circumstantial evidence alone is not enough except to show proof of the time the defect first appeared, construing *Ford Motor Co. v. Tidwell*); *Ford Motor Co. v. Tidwell*, 563 S.W.2d 831, 835 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.) (breach of implied warranty action involving turning defect on automobile, finding that proof of a defect at the time it left the manufacturer's hands is required but that circumstantial proof of when the defect came into existence is adequate).

Fiberex does not have to prove scientifically, chemically, or directly that the resin had a defect; however, Fiberex did have to do something more than demonstrate that the resin did not bond and that some batches were out of specification. *See Procter & Gamble Manufacturing Co. v. Langley*, 422 S.W.2d 773, 780 (Tex.Civ. App.—Dallas 1967, writ dism'd) (on rehearing). Fiberex must show at least circumstantially that the resin failed to laminate because of something U.S. Steel did to the resin before it left U.S. Steel's possession. In that respect, Fiberex must also dispel at least circumstantially the possibility of its own misapplication of the resin and must further demonstrate that it handled the product appropriately. If relying on circumstantial proof, Fiberex must, in effect, show that any explanation other than the existence of a defect is unlikely, and rule out the possibility that something Fiberex did, or that other variables, played a role in rendering the resin unable to bond. Such evidence would then make it probable, and

---

**5.** *Dresser* was handed down in 1985, but we find no other decisions relying on its holding, notwithstanding that one secondary source has written that the court correctly held that in a breach of warranty action there need not be a showing that the product was defective. Krahmer, *Annual Survey of Texas Law—Commercial Transactions*, 40 S.W.L.J. 187, 193 (1986).

the jury could so find, that there must have been something wrong with the resin when it left U.S. Steel's possession.[6] *See Langley*, 422 S.W.2d at 780 (implied warranty exists only when product used properly).

█ In arguments on the motion for directed verdict, Fiberex contended that if the resin's unfitness was not established by its failure to bond, then there was evidence that some batches were out of specification. However, the evidence does not show that Fiberex received any of the batches that were out of specification. The records go only from U.S. Steel to Plas–Tex, and then invoices, which do not include batch numbers, are shown from Plas–Tex to Fiberex. No records exist to show whether Fiberex received any of those batches which were out of specification. Moreover, Fiberex does not contend that all pools built during the time period in which it *could have* received such batches delaminated but only that *some* pools delaminated. Finally, the record shows that resin which does not meet technical specifications *can* cause an inconsistent product and that an inconsistent product *can* lead to delamination. This line of circumstantial proof is far too tenuous to prove the existence of a U.S. Steel—connected defect *in the resin used on the delaminated pools.* This is particularly true in light of the fact that there was no evidence to reveal what constituted excessive wax, but that the evidence did not indicate that excessive wax in a resin might take it out of specification but still render it viable for general purposes. Whether building pools would remain one of those general purposes was debated at trial.

Fiberex ceased to experience its periodic delamination once it changed to a no-wax resin. U.S. Steel's witnesses testified that U.S. Steel manufactures a number of general purpose resins and that some products can tolerate a wider range of wax content.

The evidence also suggested that the presence of wax could affect its ability to bond some surfaces, but the evidence never verified whether excessive wax in a resin alone was a defect[7], and even if so, there was no evidence that the resin used by Fiberex contained excessive wax, only that it *could have*, and this was *one possible explanation* for the periodic delamination.

In *Procter & Gamble Manufacturing v. Langley*, the court agreed that chemical proof was unnecessary and that circumstantial proof of a defect was adequate, but such circumstantial proof failed in that case: "If Mrs. Langley had faithfully complied with the written instructions and heeded the written warnings and had nevertheless sustained injury the situation would be different." *Langley*, 422 S.W.2d at 780. Similarly, in *Ford Motor Co. v. Tidwell*, although the plaintiff did produce evidence of defects at the time he bought the car, the court found the evidence as to the main turning defect insufficient to negate the possibility of misrepair or maltreatment by an intermediate dealer. *Tidwell*, 563 S.W.2d at 835.

Thus, looking at all of the evidence presented, we hold that Fiberex had the burden of proving a defect in the resin at the time it left U.S. Steel's possession and that Fiberex's proof was factually insufficient to sustain that burden and that the jury's finding was against the great weight and preponderance of the evidence. Point of error one is overruled and points of error two and three are sustained.

## BURDEN OF PROOF

Additionally, U.S. Steel's seventh point of error asserts that the trial court lowered Fiberex's burden of proof on the issue of fitness for the reason that Fiberex brought its cause of action under the UCC rather than as a common law claim. U.S. Steel argues that the burden of proof is the same

---

**6.** Only at this juncture would Fiberex then even reach a question of causation. Because Fiberex is attempting to circumstantially prove a defect, its own handling of the resin becomes relevant even though the concept of "misuse" as such normally goes to whether a defect was the proximate cause of a plaintiff's complaint.

**7.** Nor did the evidence define what actually constitutes excessive wax content. U.S. Steel does not perform quality control tests to determine the amount of wax in a resin, only its presence.

regardless of the characterization of the claim and that Fiberex failed to meet it.

Fiberex relies on *Conann Constructors, Inc. v. Muller,* 618 S.W.2d 564, 567 (Tex. Civ.App.—Austin 1981, writ ref'd n.r.e.) to support its argument that it brought forward sufficient proof to go forward to the jury and support jury findings. *Conann,* however, is distinguishable in the same material way as was *Dresser,* in that there was only one product alleged to be unfit in *Conann,* to wit: a septic system which had never worked properly. The *Conann* court did not indicate whether there was evidence of circumstances showing the possibility of other reasonable explanations for the failure of the septic tank to work properly. The court did discredit testimony suggesting that if the septic system were installed in another lot it would work perfectly. *Conann,* 618 S.W.2d at 567.

The facts of this appeal are as significant as any applicable law because it is the facts that determine the application of that law, and we find a distinction between pressure gauges and septic tanks, which are discrete pieces of equipment with limited functions, and polyester resin, which is a substance used by its purchasers in a variety of ways in manufacturing. We recognize that the purpose of a resin is to bond materials together, but when reviewing a case based upon circumstantial proof, it becomes apparent that more variables exist when a plaintiff alleges a general unidentified substance, such as "some batches of MR12214 resin shipped to us between mid–1980 and mid–1981," to be unfit than when a plaintiff presents explanations as to why an identifiable product, such as the stationary septic tank or the pressure gauge, did not work.

■ Fiberex argues that "unfit" simply means that the product did not work and then implies that any explanation as to why a product fails would be part of a causation analysis. We do not agree. Since we hold that product must be unfit at the time it leaves the manufacturer's hands and remain in substantially the same condition, an examination of why a product failed to be fit for its ordinary purpose is necessary.

If it failed to work due to some intermediate reason, then the product is not "unfit" within the meaning of the UCC. *Conann* does not lower Fiberex's burden of proof to prove how the resin was "unfit," as that term is contemplated by the UCC. U.S. Steel's seventh point of error is sustained.

*Causation*

■ U.S. Steel's fourth, fifth and sixth points of error complain that the evidence does not support findings that any resin manufactured by U.S. Steel proximately caused delamination in any pool manufactured by Fiberex. We agree with the fifth and sixth points of error. The general rule is that injury following the use of a product is not of itself alone a basis for a finding of proximate cause. Proximate cause is not to be presumed but must be proved by the evidence. *Langley,* 422 S.W.2d at 778 (and cases cited therein).

Fiberex established the following at trial: 1) Fiberex uses U.S. Steel resins to build its swimming pools; 2) Fiberex bought U.S. Steel resins during mid–1980 to mid–1981; 3) Fiberex built pools during the 1980–1981 manufacturing season and approximately 34 of those pools delaminated; 4) Fiberex kept no records of which batches were used to make any individual pool and could not give batch numbers for the resin it alleged to be unfit; and 5) the only relevant records Fiberex kept were its invoices of resins bought from Plas–Tex, the dates pools were sold, and "cash paid out" receipts for repairs made.

Fiberex claimed that only some, but not all, MR12214 resin was unfit, and it did not claim that any of the other resins used during the same approximate time as MR12214, was also unfit. Fiberex admitted that their determination of which resin could have been used in the pools which delaminated was based upon comparing records of when the delaminated pool was purchased by a customer with records of the resin purchased from Plas–Tex during that same time. From this, Fiberex filed their lawsuit complaining of MR12214, although the lack of record keeping leaves

open the possibility that the other resins may also have been used on some pools during the time frame designated by Fiberex. The record is void not only of references to batches alleged to be unfit, but it is also void of anything more than a general time frame between mid–1980 and mid–1981 when Fiberex supposedly received unfit resin.

The record is more clear, however, in regard to evidence by both parties of various *possible* causes for the delamination. Roger Yarborough, Fiberex's plant manager, testified that he could not think of any reason for the resin not to bond unless something was wrong with it. Further he stated that the problem had to be the product because they made their pools the same way every time. Yarborough went on to state that too much wax in resin could cause delamination.

Fiberex would include Yarborough's testimony among the evidence it contends is sufficient to support the jury's findings. U.S. Steel stresses that taking together all the conflicting testimony produced at trial results only in an assortment of *possible* explanations for the delamination that occurred, including evidence that Fiberex may have employed improper application techniques. No witness testified to the reasonable probability of any cause.[8] *See Insurance Company of North America v. Myers,* 411 S.W.2d 710, 713 (Tex.1966) (insufficient evidence in workers compensation case: "Causal connection ... must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture....").

U.S. Steel asserts that a variety of *possible* causes, without the benefit in a circumstantial proof case of even a probable cause, cannot amount to proximate causation, and such a finding is contrary to the weight of the evidence.

Fiberex demonstrated that some pools delaminated and that excessive wax in res-

in could cause delamination. Fiberex also presented evidence that several batches sent from U.S. Steel to Plas–Tex were out of specification. There is no proof under this record, other than through a series of inferences, that the batches which were out of specification were sent to Fiberex and then used on the delaminated pools. Further, even if Fiberex used resin which was out of specification, the testimony conflicted as to the possibility that this renders a resin defective. In other words, the resin being out of specification amounted to another possible cause for the resin's failure to bond. Inasmuch as Fiberex failed to establish the cause of the delamination, there is no way of knowing whether the defect which it alleged caused the problem.

The evidence at trial demonstrated the following as being possible explanations for Fiberex's delamination problems: 1) building the pools with wax-containing resins rather than with no-wax resins; 2) excessive wax in the resin; 3) "overspraying" onto the gel coat during Fiberex's manufacturing process; 4) the amount of catalyst Fiberex injected into the resin spray gun; 5) the brand of spray gun used by Fiberex or clogging in the gun; 6) the humidity temperature, and dust, as they affect the curing time of the resin; 7) Fiberex's failure to test each barrel of resin and utilize a blade mixer before use, as recommended; 8) resin made by U.S. Steel from "rework" or "ODD lot" materials; 9) Fiberex's failure to "backwet" sufficiently; 10) Fiberex's failure to maintain their equipment through any regular procedure; 11) inadequate "roll-out" by Fiberex in its manufacturing process; and 12) excessive water, even from a worker's sweat, which could inhibit the cure of the resin.

With the exception of reasons two and eight listed above, the possible causes for the delamination all involved in some way Fiberex's application technique. Even Fiberex's application technique was asserted as only another possible cause among

---

8. Assuming that Fiberex's employee, Yarborough, testified as an expert by his work experience, he did state that a general purpose resin should bond unless there was a defect: "... [A]s long as there was not something specifically wrong with the resin, I can't think of any resin that should not bond."

many. It would be a fair statement that the only conclusive evidence from trial was the showing that the pools delaminated and that there were numerous factors attributable to the cause.

All parties called experts to testify and not one, including those called by Fiberex (with the exception of Yarborough), testified that any factor was in all reasonable probability the cause of the delamination. The only point that the Fiberex witnesses agreed on was that the delamination was due to either poor workmanship or defective resin.

Fiberex took the position that the testimony of its experts, including that of Yarborough, amounted to the probable cause necessary for the jury to render a verdict on causation. Failing that, it argued that it could prove causation circumstantially by demonstrating the *possible* causes. In order for the jury to accept Fiberex's position, it would have to infer that the resin was unfit due to a defect present at the time it left U.S. Steel's possession; that Fiberex used the unknown defective resin in only certain pools; that the pools which delaminated were made with the unknown defective resin; and finally, the jury would have to infer that the unknown unfit resin was the proximate cause of the delamination.

Fiberex did · present some evidence of possible causes of the delamination, and U.S. Steel presented further possible explanations; however, evidence which fails to justify a finding that the resin itself was unfit also fails to support a finding that the unknown defect was the proximate cause of the damages complained of. A finding of sufficient evidence in this case could only be reached by indulging in speculation and the stacking of one inference upon another. *See Jack Roach–Bissonnet, Inc. v. Puskar,* 417 S.W.2d 262, 270 (Tex.1967) (breach of warranty and negligence actions; finding that plaintiff only proved that accident occurred and did not establish the cause of the accident, thereby rendering the evidence insufficient to prove that the defect alleged caused the accident); *Sundowner Manufacturing Company v.*

*Kinman,* 536 S.W.2d 642, 644 (Tex.Civ. App.—Texarkana 1976, no writ); *American Trailer And Equipment Company v. Medellin,* 517 S.W.2d 27, 29 (Tex.Civ.App. —San Antonio 1974, no writ) (negligence and breach of warranty actions for damages resulting from broken drive shaft on vehicle; held: plaintiff failed to produce evidence establishing causal relationship between condition of vehicle when sold and the harm complained of, to wit: no testimony that the "noise" which prompted plaintiff to seek repairs was indicative of a defective drive shaft); *Langley,* 422 S.W.2d at 777, 779.

Examining the record before us, we hold that the proof is factually insufficient and that the jury's finding that any delamination resulted from the use of U.S. Steel resin is against the great weight and preponderance of the evidence. U.S. Steel's fourth point of error is overruled and the fifth and sixth points of error are sustained.

Having prevailed on its insufficiency of the evidence points, U.S. Steel is entitled to a reversal of the judgment and a remand for new trial. Thus, we are not required to address the remaining eighteen points of error. TEX.R.APP.P. 90(a). We address certain other points, however, to aid in the prevention of error on retrial of the cause.

### DISCLAIMER OF IMPLIED WARRANTIES

U.S. Steel contends in the eleventh point of error that the disclaimers on the invoices relating to goods sold to Fiberex relieved it of liability for all implied warranties. We disagree. The record establishes that Fiberex received invoices pursuant to the purchases from Plas–Tex which contained warranty disclaimer language.

A court must determine whether a disclaimer is "conspicuous". TEX.BUS. and COMM.CODE ANN. § 1.201(10). "Conspicuous" is defined as:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as Non–Negotiable Bill of Lad-

ing) is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

The disclaimer on these invoices was in small print. In fact, the only print smaller than the disclaimer on the invoice was additional text concerning interest and attorneys fees. The standard is whether "a reasonable person against whom it is to operate ought to have noticed it". *Ellmer v. Delaware Mini–Computer Systems, Inc.*, 665 S.W.2d 158, 160 (Tex.App.—Dallas 1983, no writ). This disclaimer was not printed in large or contrasting type. The only distinguishing factor of the disclaimer was capital letters beginning the disclaimer which stated: Important Notice To Purchaser. We hold that the trial court did not err in finding the disclaimer was not so conspicuous that a reasonable person against whom it is to operate ought to have noticed it. Thus, it was ineffective. *See MacDonald v. Mobley*, 555 S.W.2d 916, 919 (Tex.Civ.App.—Austin 1977, writ ref'd n.r. e.). Point of error number eleven is overruled.

## TIMELY NOTICE UNDER DTPA

U.S. Steel asserts in point of error twelve that Fiberex is precluded from proceeding under DTPA since there was not timely notice as mandated by Section 17.-50A. We disagree. The statute provides as follows:

> (a) As a prerequisite to filing a suit seeking damages under Subdivision (1) of Subsection (b) of § 17.50 of this subchapter against any person, a consumer shall give written notice to the person at least thirty days before filing the suit *advising the person of the consumer's specific complaint and the amount of actual damages and expenses, including attorney's fees, if any,* reasonably incurred by the consumer and asserting the claim against the defendant.

TEX.BUS. & COM.CODE ANN. § 17.50A(a) (Vernon Supp.1987) (emphasis added). Fiberex filed suit on May 2, 1983.

A demand letter was sent to U.S. Steel dated June 1, 1983. U.S. Steel contends that since the notice requirement is mandatory, suits brought without proper notice are not maintainable. Fiberex points out however, that on March 25, 1982, Samuel Ablon, the president of Fiberex, sent notice to U.S. Steel of the complaints concerning the resin, set forth the amount of damages already incurred, and asked for reimbursement for the costs of correcting the delamination problems. We agree that the letter dated March 25, 1982, satisfied the DTPA notice requirements.

The Act, as amended in 1979, now requires the plaintiff to plead and prove that written notice was given at least thirty days before filing a suit seeking money damages. *Cail v. Service Motors, Inc.*, 660 S.W.2d 814, 815 (Tex.1983); *Blumenthal v. Ameritex Computer Corporation*, 646 S.W.2d 283, 286 (Tex.App.—Dallas 1983, no writ). Section 17.50A(a) requires that the consumer's written notice advise the potential defendant of the consumer's specific complaint, as well as the amount of actual damages and other expenses, including any attorneys' fees reasonably incurred. *See generally* Watson, *Defending Deceptive Trade Practices Claims*, 18 TEX.TECH L.REV. 77, 78–82 (1987). A demand letter is sufficient then if it identifies the nature of the consumer's complaint and the various amounts required to make him or her whole. *Silva v. Porowski*, 695 S.W.2d 766, 767 (Tex.App—El Paso 1985, writ ref'd n.r. e.). The section does not require the consumer to threaten suit or specify what section he thinks is violated. *Jim Walter Homes, Inc. v. Valencia*, 679 S.W.2d 29, 36 (Tex.App.—Corpus Christi 1984), *aff'd as modified*, 690 S.W.2d 239 (Tex.1985); *North American Van Lines of Texas, Inc. v. Bauerle*, 678 S.W.2d 229, 235 (Tex.App. —Fort Worth 1984, writ ref'd n.r.e.); *Barnard v. Mecom*, 650 S.W.2d 123, 127 (Tex. App.—Corpus Christi 1983, writ ref'd n.r. e.).

The purpose of a demand letter is to discourage litigation and encourage settlement of consumer complaints. *Silva*, 695 S.W.2d at 767; *Pool Company v. Salt*

*Grass Exploration, Inc.*, 681 S.W.2d 216, 219 (Tex.App.—Houston [1st Dist.] 1984, no writ); *Hollingsworth Roofing Company v. Morrison*, 668 S.W.2d 872, 875 (Tex. App.—Fort Worth 1984, no writ). The burden is on the consumer to show the giving of proper notice as evidence of his effort to comport with legislative intent. Thus, with this policy objective in mind, we turn to an examination of the March 25th letter.

The letter from Fiberex to U.S. Steel was two full pages in length. In the opening paragraph, Ablon expressed his appreciation for U.S. Steel's visit to the plant "to examine *the delamination problem [Fiberex has] experienced.*" (Emphasis added). Within the body of the letter Ablon disagreed with U.S. Steel's opinion of the possible causes for the pool delaminations. He complained that there had not been any indication from either Plas–Tex or U.S. Steel of the resin's high paraffin wax context. It was Ablon's position that U.S. Steel's failure to warn them of the high wax content of MR 12214 "resulted in a great deal of avoidable damage ... [including] inconvenience to our dealers, and a loss of much good will."

Ablon wrote that Fiberex "experienced an out of pocket cost of more than $67,000 and feel[s] strongly that [U.S. Steel] is directly responsible for this financial loss." Ablon expected reimbursement "for the costs of correcting the delamination problems" and he hoped that the reimbursement could "be handled in a business-like manner between [the] two companies, without the involvement of third party and everything that involves."

We hold that the March 25th letter met the requirements of Section 17.50A in that it expressed Fiberex's specific complaint (the delamination caused by the resin's high wax content), advised U.S. Steel of the amount of actual damages incurred ($67,-000.00), and was sent at least thirty days before filing suit. *See generally* Goodfriend and Lynn, *Of White Knights and Black Knights: An Analysis of the 1979 Amendments to the Texas Deceptive Trade Practices Act*, 33 SW.L.J. 941, 988–992 (1972) (discussion of what a notice let-

ter must contain). Moreover, it is clear that Fiberex's letter meets the legislative objective of encouraging settlements and discouraging litigation inasmuch as Ablon expressed his desire to have the matter "handled in a business-like manner ... without the involvement of a third party." U.S. Steel's twelfth point of error is overruled.

Because of our disposition of the above points of error, it is unnecessary to address the remaining points of error. The trial court's judgment is reversed and the case is remanded for a new trial.

DEVANY, J., concurs.