**MARTIN OPERATING
PARTNERSHIP LP,**
Appellant

v.

**QEP MARINE FUEL INVESTMENT,
LLC and QEP Marine Fuel
Holdings, Inc., Appellees**

NO. 14–15–00893–CV

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed April 6, 2017

Terry Wood, Beaumont, TX, Russell S. Post, Houston, TX, for Appellant.

Logan E. Johnson, Penelope E. Nicholson, Houston, TX, for Appellees.

Panel consists of Chief Justice Frost and Justices Boyce and Christopher.

## OPINION

William J. Boyce, Justice

Martin Operating Partnership LP bought a company from QEP Marine Fuel Investment, LLC and QEP Marine Fuel Holdings, Inc. (collectively, "QEP Marine"). Martin Operating sued for breach of contract in connection with this transaction; it sought indemnification from QEP Marine for the purchased company's state excise tax liability, an uncollectible account receivable, and federally mandated overtime pay obligations. The trial court signed a take-nothing summary judgment in favor of QEP Marine, which Martin Operating now challenges on appeal.

We reverse the trial court's grant of summary judgment with respect to indemnification for state excise tax liability and remand that claim for further proceedings. We affirm the trial court's grant of summary judgment with respect to indemnification for the account receivable and overtime pay claims.

### BACKGROUND

This litigation arose after Martin Operating purchased all of the equity interest in a company called Talen's Marine & Fuel, LLC from QEP Marine for $43.5 million. The price is subject to adjustment based on various post-closing contingencies and expenses.

To accomplish the purchase, Martin Operating and QEP Marine executed multiple contracts dated December 31, 2012. This appeal focuses on two contracts: (1) the Purchase Agreement; and (2) the Escrow Agreement, which is an exhibit to the Purchase Agreement.

## I. Key Contract Provisions

Martin Operating and QEP Marine created an indemnification and escrow mechanism to address claims related to Martin Operating's purchase of Talen's Marine & Fuel.

Under section 1.04(a)(iv) of the Purchase Agreement, Martin Operating paid $3.3 million of the $43.5 million purchase price as an "Escrow Amount" to an escrow agent at closing on December 31, 2012. The Escrow Amount is Martin Operating's exclusive source of payment for some—but not all—of the claims for which Martin Operating seeks indemnity. In effect, Martin Operating seeks a purchase price discount via indemnification from QEP Marine based on certain post-closing contingencies that the parties addressed in their contracts.

The parties' appellate arguments center on three post-closing contingencies for which Martin Operating seeks indemnification from QEP Marine. These contingencies are (1) liability for state excise tax; (2) an uncollectable account receivable owed by Green Field Energy Services, which the parties identify as the "Green Field Account Receivable;" and (3) liability for Fair Labor Standards Act ("FLSA") overtime pay. The indemnification and escrow mechanism does not operate in the same way for all three claims.

The parties' legal dispute turns on the interplay of the Purchase Agreement and the Escrow Agreement as applied to the three claims at issue.

***Purchase Agreement.*** Article VII governs indemnification. Under section 7.09(a)(iii), the escrow fund is Martin Operating's exclusive source of payment for indemnification claims based on the Green Field Account Receivable and FLSA overtime pay.

Excise tax liability is addressed differently. Section 7.09(a)(iii) provides that Martin Operating "may seek payment directly from" QEP Marine with respect to excise tax liability "once the Escrow Fund is exhausted, expired or has been finally disbursed . . . ."

Under section 7.03(a), Martin Operating is required "as soon as practicable [to] give written notice" to QEP Marine of an indemnification claim governed by Article VII. Sections 7.03(a) and 8.03 set out the required contents and means of delivery for the written notice to QEP Marine mandated under section 7.03(a).

Purchaser Martin Operating's opportunity to seek indemnification from seller QEP Marine for post-closing contingencies does not last indefinitely. The escrow fund has a 15–month lifespan, after which amounts remaining in escrow are to be distributed to QEP Marine. The parties dispute how distribution of any remaining escrow funds to QEP Marine must be accomplished.

Section 7.09(b) of the Purchase Agreement provides as follows: "Promptly following the 15–month anniversary of the Closing Date, Purchaser and Sellers shall deliver to the Escrow Agent joint written instructions to distribute any funds remaining in the Escrow Fund for which an indemnity claim has not been made to the Sellers . . . ." This section further provides that "such funds shall be distributed to Sellers in accordance with the Escrow Agreement." Another Purchase Agreement provision, section 6.10, applies specifically to the Green Field Account Receivable "[n]otwithstanding anything herein to the contrary . . . ."

Sections 1.04(a)(iv) and 7.09(b) of the Purchase Agreement provide that payment into and distribution from the escrow fund shall be handled in accordance with the Escrow Agreement attached as Exhibit A to the Purchase Agreement.

***Escrow Agreement.*** The escrow fund's 15–month lifespan is reflected in the Escrow Agreement.

Section 2(a)(ii) defines the "Claims End Date" as the 15–month anniversary of the closing date. Based on a closing date of December 31, 2012, the Claims End Date is March 31, 2014. This is the deadline under section 2(a)(ii) for Martin Operating to "deliver a written notice to Escrow Agent and [QEP Marine] . . . requesting that Escrow Agent distribute all or a portion of the Escrow Funds to [Martin Operating] . . . in satisfaction of such claim."

Section 2(c)(i) states as follows: "On the day following the Claims End Date . . . Escrow Agent shall deliver any Escrow Property" to QEP Marine. According to Martin Operating, this language in section 2(c)(i) "appears to suggest that the escrow funds should be distributed automatically" to QEP Marine after the Claims End Date. Martin Operating contends that this language in section 2(c)(i) conflicts with section 2(c)(iii)'s requirement of joint written instructions to distribute remaining escrow funds to QEP Marine after the Claims End Date. Section 2(c)(iii) states that, once Martin Operating's claims to the escrow fund have been resolved and disbursed, "following the Claims End Date . . . [Martin Operating] and [QEP Marine] shall deliver Joint Release Instructions to Escrow Agent instructing Escrow Agent to deliver any then remaining Escrow Property to [QEP Marine]."

QEP Marine contends that no conflict exists between sections 2(c)(i) and 2(c)(iii) of the Escrow Agreement because Martin Operating never submitted written notice of the indemnification claims at issue to the escrow agent under section 2(a)(ii). Therefore, according to QEP Marine, section 2(c)(iii)'s provision regarding joint

written instructions did not come into play and distribution of escrow funds after the Claims End Date to QEP Marine properly occurred under section 2(c)(i) without submission of joint written instructions to the escrow agent.

## II. Escrow Distribution After the Claims End Date

Three contingencies arose in the 15 months after Martin Operating closed on its purchase of Talen's Marine & Fuel from QEP Marine in December 2012.

First, Martin Operating received notice in March 2013 of more than $7.5 million in liability to the State of Texas for excise taxes incurred in connection with Talen's Marine & Fuel's purchases of motor fuel in 2010 and 2011. Second, Green Field Energy Services filed for bankruptcy in October 2013, after Martin Operating obtained a $3.8 million default judgment for the unpaid account receivable. Third, a former employee of Talen's Marine & Fuel filed a federal lawsuit in 2013 seeking certification as a collective action on behalf of other employees. The lawsuit alleged that Talen's Marine & Fuel failed to pay overtime to certain of its employees as required under the FLSA; this suit was settled for $50,000 after November 2014.

It is undisputed that Martin Operating sent letters to QEP Marine in March and April 2013, invoking its indemnity rights under Article VII of the Purchase Agreement with respect to excise taxes and the FLSA claim. In May 2013, QEP Marine responded to these indemnity claims in writing. QEP Marine's May 2013 letter "acknowledge[s] ... [QEP Marine's] ... obligation to indemnify" Martin Operating for the excise tax and FLSA claim under the Purchase Agreement.

The parties dispute whether Martin Operating sent and QEP Marine received written notice in December 2013 invoking Martin Operating's indemnity rights with respect to the Green Field Account Receivable.

It is undisputed that Martin Operating never sent written notice of an indemnification claim to the escrow agent with respect to excise taxes, the FLSA claim, or the Green Field Account Receivable. QEP Marine contends that Martin Operating was required to submit notice to the escrow agent with respect to the Green Field Account Receivable claim and the FLSA overtime claim, and that the absence of this notice mandates summary judgment in favor of QEP Marine. Martin Operating contends that the absence of such notice to the escrow agent does not foreclose its indemnification claims.

The escrow agent contacted QEP Marine in early April 2014—after the Claims End Date—to ask whether Martin Operating had made a claim on the escrow account. QEP Marine responded that Martin Operating had not done so. The escrow agent distributed the escrow funds to QEP Marine on April 15, 2014. To date, Martin Operating has received no payment for its indemnity claims based on excise taxes, the FLSA claim, or the Green Field Account Receivable.

## III. Martin Operating's Suit

Martin Operating sued QEP Marine in August 2014 alleging that QEP Marine breached the Purchase Agreement by failing to pay its indemnity claims with respect to excise tax liability, the Green Field Account Receivable, and FLSA liability. Martin Operating alleged that all conditions precedent had been satisfied. Additionally, Martin Operating alleged that QEP Marine breached a separate contractual obligation to pay the excise tax and FLSA claims arising from the May 2013 letter sent by QEP Marine in re-

sponse to Martin Operating's March and April 2013 letters. Martin Operating also asserted claims based on estoppel by contract, equitable estoppel, promissory estoppel, and quasi-estoppel. It sought attorney's fees in addition to damages. QEP Marine answered with a general denial, and the parties filed cross-motions for summary judgment.

The trial court signed an order denying Martin Operating's motion for partial summary judgment and a separate order granting QEP Marine's motion for summary judgment in its entirety. The granting of QEP Marine's motion created a final and appealable judgment by disposing of all claims. Martin Operating timely filed a notice of appeal from the order granting summary judgment in favor of QEP Marine.

### Analysis

### I. Standard of Review

The introductory portions of QEP Marine's summary judgment motion assert that QEP Marine seeks traditional and no-evidence summary judgment on all claims asserted by Martin Operating. However, in the body of the motion itself QEP Marine argues only that Martin Operating's recovery is foreclosed as a matter of law. Therefore, we construe QEP Marine's motion to invoke only the traditional summary judgment standard under Rule 166a(c). In its cross-motion Martin Operating seeks a partial summary judgment determination under Rule 166a(c) that QEP Marine breached the Purchase Agreement because it "failed to give joint written instructions to Citibank, the escrow agent, for the release of the $3,300,000 escrow amount as QEP [Marine] was required to do under Section 7.09(b) of the Purchase Agreement."

We review summary judgments *de novo. Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005). In a traditional motion for summary judgment, the movant must show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Cantey Hanger, LLP v. Byrd,* 467 S.W.3d 477, 481 (Tex. 2015). When both parties move for summary judgment and the trial court grants one motion and denies the other, we review both sides' summary judgment evidence and render the judgment the trial court should have rendered. *S. Crushed Concrete, LLC v. City of Houston,* 398 S.W.3d 676, 678 (Tex. 2013).

The trial court's summary judgment orders involved interpretation of the parties' contracts. "Absent ambiguity, contracts are construed as a matter of law." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.,* 473 S.W.3d 296, 305 (Tex. 2015). The dispute here involves two related contracts executed to effect Martin Operating's purchase of Talen's Marine & Fuel. "The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together." *Jones v. Kelley,* 614 S.W.2d 95, 98 (Tex. 1981).

Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996). A contract is not ambiguous if its language can be given a certain or definite meaning. *Plains Expl. & Prod. Co.,* 473 S.W.3d at 305. "Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous." *Id.*

## II. Indemnification Under the Purchase and Escrow Agreements

Martin Operating raises eight issues on appeal challenging the trial court's grant of summary judgment in favor of QEP Marine. The first two issues pertain to the excise tax indemnity. Issues three through six pertain to the Green Field Account Receivable. Issues seven and eight pertain to the FLSA claim. These issues are addressed below according to the claim on which they focus.

### A. Excise Tax

In its first two issues, Martin Operating contends that summary judgment in favor of QEP Marine on the excise tax claim was not warranted because (1) Martin Operating could recover on this claim without using the escrow procedure; and (2) QEP Marine did not negate damages as a matter of law.

■ QEP Marine sought traditional summary judgment on grounds that the excise tax claim "fails as a matter of law" because Martin Operating (1) "never made a disbursement request under the Escrow Agreement as it was required to do under the plain language of that contract;" and (2) "has not established that it suffered any losses on its Excise Tax Claims, and therefore cannot [establish] a necessary element for its breach of contract claim."

In its summary judgment response, Martin Operating argued generally that QEP Marine could not obtain summary judgment because it committed a "material breach of the Purchase Agreement." Martin Operating also argued that a fact question exists regarding the extent to which Martin Operating can expect a refund of amounts assessed for excise tax liability. In its cross-motion, Martin Operating sought "partial summary judgment as a matter of law that QEP [Marine] breached the Purchase Agreement" based on its "re-

fusal and failure to prepare joint written instructions [to] ... the escrow agent, as mandated by Section 7.09(b) of the Purchase Agreement." This ground in Martin Operating's cross-motion for summary judgment does not expressly seek a ruling in Martin Operating's favor with respect to the excise tax claim; therefore, it provides no potential basis to render judgment on appeal in favor of Martin Operating with respect to the excise tax claim.

As to its first summary judgment ground, QEP Marine no longer contends on appeal that Martin Operating had to make a disbursement request to the escrow agent with respect to the excise tax claim—and for good reason. Section 7.09(a)(iii) of the Purchase Agreement unambiguously carves out this claim from the mandatory escrow procedure. As Martin Operating argues on appeal, its recovery is not limited to the escrow account mechanism for an indemnity claim based on breach of section 4.07(a)'s representation that "[a]ll material Taxes of [Talen's Marine & Fuel] ... that have become due have been paid in full." Instead, section 7.09(a)(iii) allows Martin Operating to "seek payment directly from" QEP Marine for excise tax liability "once the Escrow Fund is exhausted, expired or has been finally disbursed ...." In light of this unambiguous language, QEP Marine cannot satisfy its affirmative summary judgment burden to establish that the excise tax claim is foreclosed as a matter of law because Martin Operating "never made a disbursement request" for this claim to the escrow agent.

■ As to QEP Marine's second summary judgment ground, Martin Operating argues as follows on appeal: "QEP [Marine] was correct that Martin Operating should not be able to receive a judgment on this claim until its final losses have been determined. ... [T]he excise tax

claim should be abated until the final amount of Martin Operating's loss is determined."

QEP Marine's brief contends that Martin Operating "has not suffered, and will not suffer, any damages in connection with that claim." QEP Marine points to deposition testimony from Chris Booth, who is the executive vice president, general counsel, and chief legal officer of Martin Operating's parent company. Booth testified that a portion of the excise tax paid by Martin Operating already has been refunded to it from another source. According to Booth, approximately $2.8 million in excise tax paid by Martin Operating "has not been resolved" or refunded; Booth testified that he expected this $2.8 million portion to be resolved "within six months" of the date of his deposition. Booth also stated: "Ultimately[,] I'm not looking to hold QEP [Marine] responsible for anything other than ... actual losses that Martin [Operating] suffers" with respect to excise taxes.

In its brief QEP Marine asserts that "Martin Operating is virtually assured of successfully resolving the third piece of the Excise Tax claim just as it successfully resolved the first two pieces because it is merely a matter of submitting the proper paper work and obtaining the refund." This contention does not support the trial court's summary judgment grant because the burden QEP Marine assumed under Rule 166a(c) is to negate as a matter of law at least one element of the excise tax claim—here, damages. *See, e.g., Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). The existence of damages is not negated by testimony about an unresolved portion of the excise tax claim or by speculation about "virtually assured" future recoveries.

We sustain Martin Operating's first and second issues.

## B. Green Field Account Receivable

In issues three through six, Martin Operating contends that summary judgment is erroneous with respect to the Green Field Account Receivable because QEP Marine

- breached the Purchase Agreement by acquiring the escrow funds in April 2014 without the submission of joint written instructions to the escrow agent from QEP Marine and Martin Operating;

- cannot obtain summary judgment based on Martin Operating's failure to file a claim with the escrow agent;

- materially breached the Purchase Agreement; and

- cannot obtain summary judgment based on Martin Operating's asserted failure to mitigate its damages.

We begin our analysis by reviewing in more detail the elaborate escrow procedure negotiated by QEP Marine and Martin Operating. Unpacking this procedure permits evaluation of the parties' competing contentions.

### 1. Escrow procedure

The interplay between the Escrow Agreement and the Purchase Agreement necessitates consideration of both agreements together. *See Jones*, 614 S.W.2d at 98; *see also Howell v. Homecraft Land Dev., Inc.*, 749 S.W.2d 103, 108 (Tex. App.– Dallas 1987, writ denied) (treating escrow agreement as "part of the larger closing contract" for sale of property).

- Section 1.04(a)(iv) of the Purchase Agreement provides that a $3.3 million deposit by Martin Operating will "be held in escrow in accordance with the escrow agreement to be entered into at Closing by Sellers, Purchaser and the Escrow Agent in substantially the form attached hereto

as Exhibit A (the 'Escrow Agreement')."

- Section 6.10 of the Purchase Agreement applies specifically to certain accounts receivable. Section 6.10 requires Martin Operating to use "commercially reasonable efforts" to collect the Green Field Account Receivable for at least six months before seeking this amount from the escrow fund. If these collection efforts fail, then "upon the request of [Martin Operating], [Martin Operating] and [QEP Marine] shall promptly deliver joint written instructions to the Escrow Agent" directing the agent to wire transfer funds for this claim to Martin Operating.

- Section 7.09(a) of the Purchase Agreement provides that payment from the escrow deposit is Martin Operating's "sole and exclusive remedy" for all indemnity claims other than certain specifically exempted claims. The Green Field Account Receivable claim is not exempted from section 7.09(a)'s exclusive remedy provision.

- Section 7.09(b) of the Purchase Agreement states that, "promptly" after the Claims End Date, Martin Operating and QEP Marine "shall deliver to the Escrow Agent joint written instructions to distribute any funds remaining in the Escrow Fund for which an indemnity claim has not been made to the Sellers, and such funds shall be distributed to Sellers in accordance with the Escrow Agreement."

- Section 2 of the Escrow Agreement directs the escrow agent "to hold and distribute the Escrow Property in the following manner ...." Section 2(a) covers the procedure for "Normal Distributions." Section 2(b) cov-

ers the procedure for "Disputed Distributions." Section 2(c) covers the procedure for "Final Distribution."

- The procedure for "Normal Distributions" under section 2(a)(i) allows Martin Operating and QEP Marine at any time to deliver joint written instructions to the escrow agent to distribute all or a portion of the escrow fund.

- The procedure for "Normal Distributions" under section 2(a)(ii) states that Martin Operating "may at any time on or prior to the fifteen-month anniversary of the Closing Date (the 'Claims End Date'), deliver a written notice to Escrow Agent and [QEP Marine] (a 'Purchaser Release Request') requesting that Escrow Agent distribute all or a portion of the Escrow Funds to [Martin Operating] ... in satisfaction of" an indemnity claim.

- Martin Operating's Purchaser Release Request "shall be reasonably detailed and include itemization of the Distribution Request Amount by claim as well as reasonable documentation supporting each claim."

- QEP Marine has 30 days after Martin Operating's delivery of the Purchaser Release Request to deliver to Martin Operating and the escrow agent "a notification stating in reasonable detail the claims and the amount of such claims that Sellers accept for payment as well as the claims and the amount of such claims that Sellers reject (a 'Disputed Claim') described in the Purchaser Release Request (the 'Seller Dispute Notice')."

- If the escrow agent does not receive a Seller Dispute Notice from QEP Marine within 30 days of re-

ceiving Martin Operating's Purchaser Release Request, then the escrow agent "shall disburse to [Martin Operating] ... the Distribution Request Amount."

- The procedure for "Disputed Distributions" under section 2(b) applies if the escrow agent receives a Seller Dispute Notice from QEP Marine. This procedure involves additional steps and deadlines keyed to the escrow agent's receipt of a Seller Dispute Notice within 30 days after Martin Operating delivers its Purchaser Release Request to the escrow agent and QEP Marine.

- The procedure for "Final Distribution" under section 2(c) applies after the Claims End Date, which occurs 15 months following closing.

  ○ Section 2(c)(i) says the escrow agent "shall deliver any Escrow Property (other than any Retained Funds)" to QEP Marine on the day following the Claims End Date. This section defines "Retained Funds" as "an amount of Escrow Property equal to the lesser of (A) the total amount of Escrow Property then remaining [as of the Claims End Date] and (B) the sum of (1) any outstanding Distribution Request Amounts for which the Seller Review Period for such amounts has not yet terminated and (2) any outstanding Disputed Amounts."

  ○ Section 2(c)(ii) addresses the procedure by which the escrow agent continues to hold Retained Funds after the Claims End Date.

  ○ The first sentence of section 2(c)(iii) says that this section applies "[n]otwithstanding anything in this Agreement to the contrary ...." Following the Claims End Date, the first sentence of section 2(c)(iii) directs the escrow agent to "promptly disburse" the Retained Funds to QEP Marine after deducting any "Disputed Amounts" under section 2(b)(ii) and any escrow distribution requests for which the Seller Review Period has not yet expired under section 2(a)(ii).

  ○ The second and final sentence of section 2(c)(iii) states as follows: "Once all of [Martin Operating's] claims to the Escrow Property have been finally resolved and disbursed pursuant to the terms of this Agreement, following the Claims End Date, [Martin Operating] and [QEP Marine] ... shall deliver Joint Release Instructions to Escrow Agent instructing Escrow Agent to deliver any then remaining Escrow Property to [QEP Marine]."

With this backdrop, we now turn to the parties' arguments regarding the propriety of summary judgment on the Green Field Account Receivable claim.

## 2. Propriety of summary judgment

### a. Requirement of notice to escrow agent and joint written instructions

It is undisputed that Martin Operating never submitted a Purchaser Release Request for the Green Field Account Receivable claim to the escrow agent before or after the Claims End Date. It also is undisputed that Martin Operating never asked QEP Marine to issue joint instructions with Martin Operating directing the escrow agent to release funds for this claim. Many of the parties' arguments flow from these undisputed facts.

■ According to QEP Marine, these circumstances mandate summary judgment in its favor on the Green Field Account Receivable claim. QEP Marine argues as follows: "[I]n order to recover on an indemnity claim, Martin operating had

to assert a claim to the Escrow Funds by the Claims End Date by delivering a [Purchaser Release Request] to the Escrow Agent" under section 2(a)(ii) of the Escrow Agreement. It continues: "If Martin Operating did not assert such a claim by the Claims End Date, then the Escrow Agent had an automatic duty to release the Escrow Funds to QEP [Marine] on the day after the Claims End Date" under section 2(c)(i) of the Escrow Agreement.

Martin Operating contends that sections 2(c)(i) and 2(c)(iii) of the Escrow Agreement are "internally inconsistent;" in its view, section 2(c)(i) "appears to suggest that the escrow funds should be distributed automatically, without any need for 'joint written instructions'" but section 2(c)(iii) requires joint written instructions to the escrow agent. Martin Operating further contends that section 2(c)(iii) itself is "internally inconsistent" because the first sentence "indicates that the escrow agent will automatically return any funds to the seller" but the second sentence "continues by contemplating (like the Purchase Agreement) that the parties would provide joint instructions . . . ."

Our reading of the Escrow Agreement confirms that section 2's unambiguous terms establish a detailed, comprehensive, and internally consistent procedure for submitting an indemnity claim based on the Green Field Account Receivable.

Martin Operating is not required to seek indemnification for the Green Field Account Receivable claim; but under section 2(a)(ii), it "may at any time on or prior to the fifteen-month anniversary of the Closing Date (the 'Claims End Date') deliver a written notice to Escrow Agent and [QEP Marine] (a 'Purchaser Release Request') requesting that Escrow Agent distribute all or a portion of the Escrow Funds to [Martin Operating] . . . in satisfaction of such claim (the 'Distribution Request Amount')." If Martin Operating does *not* submit a Purchaser Release Request to the escrow agent by the Claims End Date under section 2(a)(ii), then distribution of the escrow amount to QEP Marine after the Claims End Date occurs under section 2(c)(i) and the first sentence of section 2(c)(iii) without the necessity of joint written instructions from both parties to the escrow agent. If Martin Operating *does* submit a timely Purchaser Release Request to the escrow agent under section 2(a)(ii), then after the Claims End Date the parties must deliver joint instructions to the escrow agent directing it to "deliver any then remaining Escrow Property" to QEP Marine "[o]nce all of [Martin Operating's] claims to the Escrow Property have been finally resolved and disbursed pursuant to the terms of" the Escrow Agreement.

Submission of a Purchaser Release Request to the escrow agent under section 2(a)(ii) is an integral part of the intricate escrow procedure negotiated by sophisticated parties to address an anticipated post-closing contingency arising from the Green Field Account Receivable. Different procedures and timelines apply depending on whether Martin Operating does or does not deliver a Purchaser Release Request to QEP Marine and the escrow agent. Section 2(a)(ii) establishes a 30–day deadline following delivery of the Purchaser Release Request to the escrow agent and QEP Marine for QEP Marine to review and, if QEP Marine so chooses, dispute the request. In turn, the escrow agent's subsequent actions and specific deadlines under sections 2(a)(ii), 2(b), and 2(c) are linked to whether QEP Marine does or does not dispute a Purchaser Release Request delivered by Martin Operating to QEP Marine and to the escrow agent.

In light of section 2's unambiguous terms, we reject Martin Operating's char-

acterization of this provision's detailed procedures as "internally consistent" and mere "technical requirements." The differences that Martin Operating characterizes as internal inconsistencies within section 2 actually reflect alternative procedures applicable in particular circumstances. The Escrow Agreement does not require a joint written request to the escrow agent to release escrow funds to QEP Marine in all possible scenarios arising after the Claims End Date. These parties anticipated multiple scenarios and drafted the Escrow Agreement to address them. The particular scenario at issue here is one in which Martin Operating did not deliver a Purchaser Release Request to QEP Marine and the escrow agent under section 2(a)(ii) before the Claims End Date. Because Martin Operating did not deliver a Purchaser Release Request, the procedures and timelines applicable to reviewing and disputing such a request did not come into play under sections 2(a)(ii), 2(b), and 2(c). And because the procedures and timelines applicable to reviewing and disputing a Purchaser Release Request did not come into play, joint instructions to the escrow agent were not required to release the escrow amount to QEP Marine after the Claims End Date under section 2(c)(i).

We next address Martin Operating's contention that sections 6.10 and 7.09(b) of the Purchase Agreement require joint written instructions from Martin Operating and QEP Marine before any remaining escrow amounts properly could be released to QEP Marine after the Claims End Date—even though Martin Operating did not submit a Purchaser Release Request to the escrow agent under section 2(a)(ii)

of the Escrow Agreement. Martin Operating also asserts that specific language in section 6.10 of the Purchase Agreement governs the Green Field Account Receivable claim "regardless of the effect of the general rules governing the escrow account" elsewhere in the Purchase Agreement and the Escrow Agreement. Martin Operating argues that (1) the other "general provisions" in the Purchase Agreement and Escrow Agreement do not impose any obligation on Martin Operating to give notice to the escrow agent; and (2) QEP Marine had actual notice of issues concerning the Green Field Account Receivable claim. Alternatively, Martin Operating contends that summary judgment is inappropriate because the Purchase Agreement and Escrow Agreement are ambiguous.

Section 6.10 of the Purchase Agreement applies specifically to the Green Field Account Receivable "[n]otwithstanding anything herein to the contrary ...." This section imposes a unique requirement for this indemnity claim by directing Martin Operating to use "commercially reasonable efforts" to collect this account receivable for no less than six months after the December 2012 closing. If these efforts fail, then "upon the request of [Martin Operating], [Martin Operating and QEP Marine] shall promptly deliver joint written instructions to the Escrow Agent directing the Escrow Agent to wire transfer all or any portion of the Uncollected Receivable Amount requested by [Martin Operating] ...." It is undisputed that Martin Operating made no such request to QEP Marine for prompt delivery of joint written instructions to the escrow agent.[1] Therefore,

---

1. The parties dispute whether Martin Operating sent and QEP Marine received a December 19, 2013 letter giving notice to QEP Marine of the Green Field Account Receivable claim. Martin Operating contends that QEP Marine had notice via this letter of Martin Operating's desire to invoke indemnity rights with respect to the Green Field Account Receivable claim. The analysis here does not change even if we assume that Martin Operat-

section 6.10 does not require joint written instructions for release of the escrow funds after the Claims End Date.[2]

Section 7.09(b) of the Purchase Agreement states in full as follows: "Promptly following the 15–month anniversary of the Closing Date, [Martin Operating and QEP Marine] ... shall deliver to the Escrow Agent joint written instructions to distribute any funds remaining in the Escrow Fund for which an indemnity claim has not been made to the Sellers, and such funds shall be distributed to Sellers in accordance with the Escrow Agreement."

■ In construing this language, our primary concern is to ascertain the parties' true intent as expressed in the instrument they created. *See, e.g., J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citing *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980), and *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). In so doing, we avoid unreasonable constructions when possible; we also consider the entire contract, giving effect to all provisions so that none are rendered meaningless. *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305. "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Id.* We give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.* And because of the contracts' interrelated nature, we construe the Purchase Agreement and the Escrow Agreement together. *See Jones*, 614 S.W.2d at 98; *Howell*, 749 S.W.2d at 108.

Applying these principles, we decline Martin Operating's invitation to (1) read section 7.09(b) of the Purchase Agreement in isolation; (2) give that section controlling effect over the detailed procedure set forth in section 2 of the Escrow Agreement; or (3) hold that the parties' contract language is ambiguous.

Sections 1.04(a)(iv) and 7.09(b) of the Purchase Agreement apply the Escrow Agreement's procedures to the Purchase Agreement. Reading section 7.09(b) in isolation to require joint written instructions in the absence of a Purchaser Release Request from Martin Operating is not a reasonable interpretation. Martin Operating's proffered reading is unreasonable because it renders meaningless those portions of section 2 of the Escrow Agreement allowing release of escrow funds without joint written instructions if Martin Operat-

---

ing sent and QEP Marine received the December 2013 letter. A dispute over Martin Operating's notice to QEP Marine via the December 2013 letter is distinct from—and immaterial to—the separate inquiry into whether Martin Operating asked QEP Marine to issue joint instructions to the escrow agent under section 6.10 to release indemnity funds for this claim. Martin Operating does not contend that it asked QEP Marine to issue joint instructions in the December 2013 letter or otherwise. The letter itself contains no such request. According to Martin Operating, "[B]y the time Martin Operating called QEP [Marine] to discuss its rights to the Green Field account receivable, QEP [Marine] had already obtained the escrow fund from [the escrow agent] by (wrongfully) informing [the escrow agent] that no claims had been filed." It is undisputed that this discussion with the escrow agent and the distribution of escrow funds to QEP Marine occurred after the Claims End Date already had passed.

**2.** Given the undisputed absence of a request from Martin Operating for joint written instructions to the escrow agent with respect to the Green Field Account Receivable claim, we need not address whether section 6.10 of the Purchase Agreement would operate to the exclusion of the Escrow Agreement's section 2 if Martin Operating had asked QEP Marine to deliver joint written instructions to the escrow agent.

ing does not submit a Purchaser Release Request to QEP Marine and the escrow agent by the Claims End Date. Insofar as any tension exists between section 7.09(b)'s more general procedure and section 2's more specific procedure for disbursement of escrow funds, the more specific procedure in section 2 of the Escrow Agreement controls. *See, e.g., NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

### b. Condition precedent

■ Martin Operating contends that the absence of a Purchaser Release Request cannot properly be treated as the non-occurrence of a condition precedent or as a material breach by Martin Operating that precludes indemnification for the Green Field Account Receivable claim from the escrow account.[3] We conclude that the Purchaser Release Request was a condition precedent; the absence of such a request forecloses indemnification with respect to the Green Field Account Receivable claim.

Relying on *Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990), Martin Operating argues that submission of a Purchaser Release Request to the escrow agent should not be treated as a condition to indemnification for the Green Field Account Receivable in the absence of conditional language in the Purchase Agreement and the Escrow Agreement such as "if," "provided that," or "on condition that."[4] Martin Operating argues more generally that conditions are disfavored. *See, e.g., Hirschfeld Steel Co., Inc. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 281 (Tex. App.–Houston [14th Dist.] 2006, no pet.).

According to Martin Operating, "[n]othing in the Escrow Agreement or the Purchase Agreement conditions Martin Operating's right to indemnity on filing a claim with the escrow agent." Martin Operating assails a circumstance under which it "forfeited a multi-million dollar indemnity obligation based solely on a technicality." Martin Operating also points to section 7.08 of the Purchase Agreement, which states as follows: "So long as an Indemnified Party asserts a claim for indemnification under and in accordance with this Article VII

---

**3.** Martin Operating also contends that it had no obligation to prove the occurrence of a condition precedent because it pleaded that all conditions precedent had been satisfied and QEP Marine did not specifically deny this allegation. *See* Tex. R. Civ. P. 54. We do not consider this argument because Martin Operating did not expressly present the argument to the trial court. *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) ("With the exception of an attack on the legal sufficiency of the grounds expressly raised by the movant in his motion for summary judgment, the non-movant must expressly present to the trial court any reasons seeking to *avoid* movant's entitlement [to summary judgment].") (emphasis in original); *FWT, Inc. v. Haskin Wallace Mason Prop.*

*Mgmt., L.L.P.*, 301 S.W.3d 787, 792 & n.2 (Tex. App.–Fort Worth 2009, pet. denied) (refusing to consider as a ground for reversing summary judgment a Rule 54 argument that appellant did not expressly present to the trial court).

**4.** Martin Operating does not argue that conditional language is missing from section 6.10 of the Purchase Agreement. This section directs that Martin Operating and QEP Marine will "promptly deliver joint written instructions" to the escrow agent "upon the request" of Martin Operating "[i]f [Martin Operating] is unable to collect" the Green Field Account Receivable. As discussed above, it is undisputed that Martin Operating did not request joint written instructions to the escrow agent with respect to the Green Field Account Receivable claim.

prior to the expiration of the applicable survival period . . . such Indemnified Party shall be deemed to have preserved its rights to indemnification under this Article VII regardless of when such claim is ultimately liquated or resolved."

These contentions fall short because they overlook the comprehensive nature of an intricate escrow procedure created for a significant business transaction by sophisticated parties whose contract documents prospectively addressed a variety of contingencies in connection with the sale of Talen's Marine & Fuel.

"In order to determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract." *Criswell*, 792 S.W.2d at 948 (citing *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983), and *Gallup v. St. Paul Ins. Co.*, 515 S.W.2d 249 (Tex. 1974)). The use or absence of phrases such as "if," "provided that," "on condition that," or similar terms is probative but not dispositive. *See Criswell*, 792 S.W.2d at 948. The dispositive circumstance here is that the parties agreed upon an escrow procedure that was (1) spelled out in detail in a 13–page, single spaced Escrow Agreement replete with multiple defined terms, reciprocal obligations, contingent deadlines, and limits on the escrow agent's actions; and then (2) referenced in sections 1.04(a)(iv) and 7.09(b) of the Purchase Agreement, which direct that escrow funds available to indemnify Martin Operating will be handled "in accordance with" the Escrow Agreement. Because the Purchase Agreement provides that escrow funds will be handled "in accordance with" the Escrow Agreement, section 7.08 likewise contemplates procedures "in accordance with" the Escrow Agreement by referring to an indemnification claim made

"under and in accordance with this Article VII . . . ."

When it dismisses the requirement of a Purchaser Release Request to the escrow agent as an insignificant "technicality" rather than a condition precedent, Martin Operating impermissibly attempts to change the Escrow Agreement's prospective procedures for addressing potential indemnity claims arising after closing. Allowing Martin Operating to excise the Purchaser Release Request requirement from section 2(c)(ii) would be unfaithful to the terms of the parties' agreement, prejudice QEP Marine, and muddy the escrow agent's duties. Jettisoning required delivery of the Purchaser Release Request deprives QEP Marine of section 2(a)(ii)'s 30–day "Seller Review Period" within which to review a Purchaser Release Request; the Seller Review Period is keyed to the date on which the Purchaser Release Request is delivered to both QEP Marine and the escrow agent. In turn, QEP Marine's time frame for disputing a Purchaser Release Request expires at the end of the Seller Review Period. The escrow agent's subsequent obligations and deadlines differ depending on whether QEP Marine opts to dispute a Purchaser Release Request.

We reject Martin Operating's attempt to rewrite the Escrow Agreement because the escrow procedures cannot plausibly be characterized as "peripheral." *Cf. S. Tex. Elec. Coop. v. Dresser–Rand Co.*, 575 F.3d 504, 509 (5th Cir. 2009) (Evidence supported jury finding that purchaser was excused from invoking dispute resolution procedures before suing for defective turbine; "the central object of this contract was to install a steam turbine, not to decide how the parties would proceed in the event that a dispute over that turbine arose. In light of this, a reasonable jury could conclude that the dispute resolution procedures were peripheral to, rather than

a central object of, the contract."). To the contrary, the parties entered into the Escrow Agreement precisely because they sought to create a comprehensive escrow mechanism to address the Green Field Account Receivable and other post-closing contingencies arising from the sale of Talen's Marine & Fuel.[5]

### c. Conclusion

Applying the Escrow Agreement's unambiguous language to the Green Field Account Receivable indemnity claim, we conclude that QEP Marine did not breach its contractual obligations by obtaining disbursement of the escrow funds after the Claims End Date without joint written instructions. The undisputed absence of a Purchaser Release Request to the escrow agent by Martin Operating means that QEP Marine properly could obtain escrow funds under section 2 of the Escrow Agreement without joint instructions. Because the Purchase Agreement expressly states that escrow funds must be handled "in accordance with" the Escrow Agreement, this circumstance likewise establishes that QEP Marine did not breach the Purchase Agreement.[6]

We overrule Martin Operating's third, fourth, fifth, and sixth issues.

### C. FLSA Overtime Claim

Martin Operating assails the grant of summary judgment on the FSLA overtime claim in issues seven and eight. Martin Operating contends it was not required to file a claim with the escrow agent with respect to the FLSA claim, and that QEP Marine's acknowledgement of this indemnity obligation in its May 2013 letter allows enforcement under various forms of estoppel.

We need not reach these arguments because both sides acknowledge that the

---

**5.** We likewise reject Martin Operating's reliance on *South Texas Electric Coop*, 575 F.3d at 509, for the proposition that Martin Operating substantially complied with section 2(a)(ii)'s requirement to deliver a Purchaser Release Request to the escrow agent based on "QEP's actual notice of concerns with the Green Field account receivable." This is a reference to the December 2013 letter, receipt of which is disputed by QEP Marine. Even assuming that Martin Operating sent and QEP Marine received the December 2013 letter, this letter cannot establish substantial compliance with section 2(a)(ii)'s requirement for Martin Operating to deliver a separate Purchaser Release Request to the escrow agent. Asserted notice to QEP Marine does not operate as notice to the escrow agent or operate to excuse the absence of a Purchaser Release Request to the escrow agent. The December 2013 letter does not "include itemization of the Distribution Request Amount by claim as well as reasonable documentation supporting each claim" required under section 2(a)(ii). Martin Operating identifies no Escrow Agreement provision under which delivery of a Purchaser Release Request to QEP Marine also operates as delivery to the escrow agent. Section 13 of the Escrow Agreement contains detailed and explicit requirements for delivering "notices, requests, claims, demands and other communications" to the escrow agent. Separate notice requirements comport with the Escrow Agreement's structure and purpose because section 2 imposes different obligations and deadlines on QEP Marine and the escrow agent following receipt of a Purchaser Release Request from Martin Operating. Additionally, Martin Operating contends that QEP Marine received "actual notice" of "the issues with the Green Field account receivable" because this topic was addressed during purchase negotiations that preceded closing. This contention fails because it ignores the detailed procedure these parties created in the Escrow Agreement as a result of those negotiations.

**6.** This conclusion makes it unnecessary to address the parties' additional contentions regarding the materiality of QEP Marine's asserted breach, Martin Operating's asserted failure to mitigate its damages, and the correct computation of Martin Operating's recovery on the Green Field Account Receivable claim.

$50,000 settlement of the FLSA claim is less than the $500,000 deductible established under section 7.07(a) of the Purchase Agreement. Because the FLSA overtime claim does not meet the deductible, Martin Operating is not entitled to recover on this indemnification claim.

We overrule Martin Operating's seventh and eighth issues.

### CONCLUSION

We reverse the trial court's grant of summary judgment in favor of QEP Marine on the excise tax claim and remand that claim for further proceedings consistent with this opinion. We affirm the remainder of the trial court's judgment.